CHESTER R. SWEDE AND RAYMOND DeLUCA, PLAIN-TIFFS-APPELLANTS, v. THE PASSAIC DAILY NEWS, A CORPORATION OF THE STATE OF NEW JERSEY, IMPLEADED WITH ANOTHER, DEFENDANT-RESPOND-ENT.

Argued June 5, 1959—Decided July 2, 1959.

322 

*Mr. Harry Green* argued the cause for plaintiffs-appellants.

*Mr. Walter D. Van Riper* argued the cause for defendant-respondent (*Messrs. Van Riper & Belmont,* attorneys).

The opinion of the court was delivered by

SCHETTINO, J. Plaintiffs appeal from a final judgment of the Superior Court, Law Division, dismissing plaintiffs' complaint for libel against defendant, *The Passaic Daily News,* and from an order denying plaintiffs' motion for a new trial and to set aside the dismissal of the complaint. This defendant's motion was made after plaintiffs rested, having submitted evidence only on the issue of liability; *R. R.* 4:42–2(*b*). The complaint against defendant Fitzgerald was later dismissed by consent and with prejudice. While the appeal to the Appellate Division was pending, we certified pursuant to *R. R.* 1:10–1(*a*).

At the time of the alleged libels plaintiffs were patrolmen in the City of Clifton police department and had finished first and second, respectively, in the Civil Service examination for promotion to sergeant. The City of Clifton has a

council-manager form of government. Fitzgerald was the City Manager of Clifton.

In the evening of December 27, 1956 the Clifton city councilmen met in a special session to consider, primarily, fiscal matters. Fitzgerald attended the meeting after leaving a board of health Christmas party at which he admitted he had two drinks. Fitzgerald was asked by two of the councilmen why he was planning to bypass plaintiffs and appoint two others to the rank of sergeants. Plaintiffs' complaint alleges that Fitzgerald responded:

"You want to know why they (meaning this plaintiff, Chester R. Swede, and Raymond DeLuca) were skipped? I'll tell you why. Insubordination that's the reason. I should have fired them (meaning this plaintiff, Chester R. Swede, and Raymond DeLuca)."

The report of this statement was published in its newspaper by defendant, *The Passaic Daily News* (hereinafter "defendant") on December 28, 1956. It was also mentioned in the articles written concerning the aftermath of the incident on eight subsequent occasions.

We deem it necessary to set forth at length the news articles referred to by plaintiffs. In the initial news article the only reference to the alleged defamatory statement was the following:

"Brogan said 'politics' had been claimed in the skipping of Swede and DeLuca. He then asked Fitzgerald why the men had been passed over.
'You want to know why they were skipped?' Fitzgerald said, 'I'll tell you why. Insubordination, that's the reason. I should have fired them.'"

A news report published by defendant on January 3, 1957, entitled "Censure Attempt Fails Over Police Promotions," recited, in part:

"The Clifton City Council last night rejected several attempts to censure John L. Fitzgerald, retiring city manager, for his surprise police promotions of last week. It also decided to proceed with an

investigation of insubordination charges made by Fitzgerald against two patrolmen who were bypassed for promotions.

\* \* \* \* \* \* \* \*

The resolution proposing that Fitzgerald's charge that Swede and DeLuca had been insubordinate be investigated was referred to the legal department. Edward Johnson, city counsel, was instructed to report at the next meeting what procedure should be followed in such an investigation.

\* \* \* \* \* \* \* \*

'I want an investigation of the insubordination charges,' Zwier said. 'If these men were insubordinate, they should have been brought up on charges long ago.'

No Details Given.

Zwier maintained that all charges of insubordination should be brought to the council's attention.

Last week, Fitzgerald said he had not promoted Swede and DeLuca because they had been insubordinate. Pressed for an explanation, he failed to do so."

On January 23, 1957 defendant reported, in pertinent parts:

"John L. Fitzgerald, retiring Clifton city manager, who is vacationing in Florida, has denied ever stating that he should have fired two Clifton patrolmen who were bypassed in promotions to sergeant, it was learned today. ·

His denial is contained in a letter to the Clifton City Council which was received on Monday.

The letter reportedly also says that Fitzgerald will consider engaging counsel if the City Council does not discontinue 'threatening' him.

During the last few weeks, members of the council have demanded that an investigation be made of Fitzgerald's statement that Patrolmen Raymond DeLuca and Chester R. Swede had been insubordinate and 'should have been fired.' *The manager made the statement at a regular council session December 27.* At that time, he refused to elaborate when asked to do so by councilmen.

Miss Edith M. Marrion, city clerk, this morning admitted receipt of the letter. She said, however, she could not release it until she had been authorized to do so by a majority of the City Council.

\* \* \* \* \* \* \* \*

Fitzgerald created a storm in the council when he made the statements concerning DeLuca and Swede." (Emphasis added.)

On January 29, 1957, in reference to the letter of Fitzgerald, defendant reported in its newspaper that at the Clifton council meeting the night before that the following took place:

"Noting in his opening paragraph that he has followed reports of council meetings in The Herald-News since his departure late in December, Fitzgerald wrote:

'Please be advised that I have never charged Patrolmen (Raymond) DeLuca or (Chester) Swede with insubordination nor did I ever make the remark they should be fired.'

\* \* \* \* \* \* \* \*

The promotions angered several members of the council, but they have stuck. The council is considering investigation into the charges which Fitzgerald now says he did not make against DeLuca and Swede, both skipped when Hornby and Shockner were named."

On February 6, 1957 in an article subtitled "Governing Body in Accord on Resolution: Will Absolve Swede, DeLuca of 'Charges,' " the newspaper stated:

"The Clifton City Council last night decided to censure John L. Fitzgerald, retiring city manager, for making statements he later denied. At the same time, it absolved two patrolmen of insubordination charges made by Fitzgerald.

Fitzgerald in Florida.

After being pressed by Councilmen William R. Brogan and Stanley Zwier against dropping the action, the entire council informally agreed to adopt a resolution at the next meeting.

The resolution will censure Fitzgerald, now vacationing in Florida, for stating and later denying he had ever said that Patrolmen Raymond DeLuca and Chester Swede had been insubordinate and 'should have been fired.' It also will clear the men of any charges."

On March 6, 1957 defendant's report, entitled "Fitzgerald Censure Resolution Before Council in Two Weeks," stated:

"After failing to act on the matter at its last meeting, the Clifton City Council last night decided to censure John L. Fitzgerald, retiring city manager, for making a verbal charge of insubordination against two patrolmen and later denying he had made the statement.

In a resolution to be drawn by the legal department, the council also ordered that the patrolmen, Raymond G. DeLuca and Chester R. Swede, will be exonerated of any insubordination charges. The resolution will be acted on at the March 19 meeting.

Statements Denied.

DeLuca and Swede were bypassed in promotions to sergeant in February, 1955. At his last official meeting before going to Florida at the end of last December, Fitzgerald charged the men had been skipped because they had been 'insurbodinate.' He said the men 'should have been fired.' Fitzgerald retired as city manager as of

March 1 and was succeeded by William Holster. Fitzgerald, still in Florida, has denied making the statements in a letter to the council." (Emphasis added)

This article particularly reported many favorable comments made by the councilmen regarding plaintiffs, such as a statement that "I'm convinced that Swede and DeLuca are fine patrolmen and are doing a fine job for the city." On March 20, 1957, in an article entitled "No Action Taken on Fitzgerald Censure," it was stated:

"The Clifton City Council later failed to act on a resolution censuring John L. Fitzgerald, retired city manager, and exonerating two patrolmen of charges that they had been insubordinate.
\* \* \* \* \* \* \* \*
The resolution would have censured Fitzgerald who is vacationing in Florida, for a statement he made at a meeting in December that Patrolmen Raymond G. DeLuca and Chester R. Swede were by-passed in promotions to sergeant because they had been 'insubordinate' and 'should have been fired.' Subsequently, in a letter to the council, Fitzgerald denied making the statement."

On April 3, 1957 defendant published an article reporting that action on the proposed censure of Fitzgerald was postponed again at the council meeting of April 2, 1957, and said:

"The measure, which is not expected to get sufficient support for passage, would censure Fitzgerald for a remark he made at a meeting last December in which he charged DeLuca and Swede with 'insubordination' and said 'they should have been fired.' The official later denied making the statement. Fitzgerald is expected back soon from an extended Florida vacation.
Fitzgerald made his remark in explaining why DeLuca and Swede had been bypassed in promotions to sergeant.
The resolution also would exonerate the patrolmen of any charges."

On April 18, 1957 the newspaper reported that the council had voted 4–3 to censure Fitzgerald and to exonerate plaintiffs of any wrongdoing. In the course of this report defendant stated:

"Fitzgerald had been criticized for a statement he made at a council meeting last December before he left for Florida. Asked why

DeLuca and Swede had been bypassed in promotions, Fitzgerald replied that they had been 'insubordinate' and 'should have been fired.' "

Plaintiffs' complaint alleged that the above constituted improper publication of malicious and defamatory matter and demanded compensatory and punitive damages against this defendant.

Defendant's answer denied that the writings were defamatory and that they were published with malice. Among its separate defenses defendant stated: "The articles complained of were based upon an official statement made publicly by the defendant, Fitzgerald, in the course of his duties as City Manager * * * and, as such City Manager the head of the Police Department of said City of Clifton, and the statements made by the said Fitzgerald were accepted by this defendant in good faith and the publication thereof was privileged"; that defendant was fulfilling its duties to the citizens of Clifton by informing them of the conduct of the police department by the city manager; that the publication of the articles was a "fair and accurate report of an official proceeding" and was therefore privileged. It also pleaded various other separate defenses.

 In our review of a judgment dismissing a complaint at the end of plaintiffs' case, we consider the testimony and the inferences reasonably deducible therefrom in a light most favorable to plaintiffs, *DeRienzo v. Morristown Airport Corp.,* 28 *N. J.* 231, 236 (1958), provided the inferences are bottomed upon evidence. *Gnapinsky v. Goldyn,* 23 *N. J.* 243, 252 (1957).

Plaintiffs read into evidence the deposition of defendant, Fitzgerald, who had testified therein that the discussion pertaining to the plaintiffs did not take place "at the council meeting" but that "The council meeting adjourned to the conference room, which they usually do after all meetings, and that's when this question of Swede and DeLuca [the plaintiffs] was brought up"; that although members of the press were also present in the conference room, it was not

an open gathering because "Our conferences are not open to the public. The press are admitted there by privilege of the governing body which was instituted about twenty-some-odd years ago." When asked if the reporters could report anything occurring at such a conference, he answered that "Originally it was assumed that they would not put anything in of a controversial nature. It was originally assumed that way. That is about twenty-some-odd years ago." Referring to the inception of the conference room proceedings he said:

"Well, after the meeting came to order in the conference room, Councilman Sullivan stated he had heard a rumor that there were going to be some promotions in the police department, and I told him he was correct, that I intended to appoint [two officers other than plaintiffs] ; and I said the rumor was correct * * *. Then there was quite an argument that started by Mr. Brogan and Mr. Sullivan [two of the councilmen] and they were very angry about it. * * * Mr. Sullivan * * * said I promised not to make any appointments until I consulted with the governing body, and I said that was correct.

I had made that promise but I had read the law. In fact, I got the law book out where it stated that the council was not to interfere with the City Manager's promotion or performance of his duties, and that was my reason for not notifying them.

Then Mr. Brogan continually kept questioning me as to why I had skipped the other two men and I made the statement that they were insubordinate and they should be fired.

The meeting didn't last more than ten minutes. It didn't last very long—that is, the conference."

He also stated that the conference meeting was for the purpose of taking up in private unfinished business; that no minutes were taken; that at the conference Brogan attempted to introduce certain resolutions pertaining to the promotions after Fitzgerald made his statements to the council and that the question of promotions concerning plaintiffs was the only subject matter discussed.

The City Clerk of Clifton was called by plaintiffs. She testified that the meeting of December 27, 1956, was a special business meeting, that the meeting assembled in the conference room, and that she did not think there was any

other meeting after that special meeting. In answer to plaintiffs' suggestion that she "state generally what business they transacted at that meeting," she said:

"This was a meeting to clear up the matters pending before the end of the year. There were various payments under contracts. There [was] a longclaim list of bills that had to be cleared up before the end of the year. There were some resolutions in here which authorized cancellation of unexpended balances in the various budget accounts, and there is one resolution, I believe, here which authorized the issuance of promissory notes by the City Treasurer. And then there are two motions which were made by Councilman Brogan and which received no second in the meeting."

She stated that the meeting adjourned after Brogan's two motions were made but not seconded. Thereafter, the witness testified:

"Well, first may I say that there was nothing before me at this meeting on any appointments to be made by Mr. Fitzgerald. The discussion came up in the council meeting and the question was obviously asked by Mr. Brogan as to something, whether Mr. Fitzgerald [was] going to make any appointments, and it got into a very lengthy, heated discussion. I do not remember all the discussion that took place. As I say, I do not take those things down unless they make a motion. When they make a motion, I take it down and I record it in the minutes."

In answer to a question as to whether the resolutions were offered by Mr. Brogan before or after the discussion between Fitzgerald, Sullivan and Brogan, she stated they were offered after the discussion. This coincides with Fitzgerald's testimony. On cross-examination she stated that after the special business meeting she did not believe there was any conference meeting of the city council.

Defendant moved for a judgment of dismissal at the close of plaintiffs' case on the issue of liability, arguing that there was a privilege to publish and that no malice was shown. Plaintiffs argued that defendant had no privilege and therefore took the risk of the veracity of Fitzgerald's statement; that the "repeated publication of the libel on

at least ten [eight] occasions" was evidence of malice on the part of defendant, and that the statement made by Fitzgerald was of purely local interest to the citizens of Clifton and as defendant's total circulation is 63,000 copies of its newspaper, only 18,000 of which were sold within Clifton, the publication was excessive. The trial court granted defendant's motion, holding that there was a qualified privilege and in effect holding that there was no evidence of malice or of excessive publication.

On this appeal plaintiffs argue that the trial court erred in finding a privilege and lack of malice because privilege is a matter of defense and malice is a matter of rebuttal, and the trial court also erred in depriving plaintiffs of an opportunity to rebut and to produce evidence of malice. Plaintiffs additionally argue that they submitted sufficient evidence of actual malice and of excessive publication which defeated defendant's privilege.

■ The law of defamation embodies the important public policy that individuals should generally be free to enjoy their reputations unimpaired by false and defamatory attacks. *Leers v. Green,* 24 *N. J.* 239, 251 (1957); *Rainier's Dairies v. Raritan Valley Farms, Inc.,* 19 *N. J.* 552, 557 (1955); *Rogers v. Courier Post Co.,* 2 *N. J.* 393 (1949). See also, *Prosser, Torts (2nd ed.* 1955), 572 *et seq.; Restatement, Torts,* § 558 *et seq.* (1938).

■ However, there is also a vital counter policy that in certain situations there is a paramount public interest permitting persons to speak or write freely without being restrained by the possibility of a defamation action. *Coleman v. Newark Morning Ledger Co.,* 29 *N. J.* 357, 376–379 (1959); *Rainier's Dairies, supra.* In such situations, the courts recognize a privilege or immunity. "The reason for holding any occasion privileged is 'common convenience and welfare of society, and it is obvious that no definite line can be so drawn as to mark off with precision those occasions which are privileged, and separate them from those which are not.' *Stuart v. Bell,* [1891] 2 *Q. B.* 341, 346, Lindlew

L. J." *Coleman, supra* (29 *N. J.* at *page* 378). The privilege may be absolute or qualified. An absolute privilege affords a complete defense irrespective of malice or motive on the part of the publisher. The qualified privilege affords protection only if there is no ill motive or malice in fact. *Rainier's Dairies, supra* (19 *N. J.* at *page* 558); *Coleman, supra; Restatement, Torts* §§ 583–612; *Prosser, supra,* 607 *et seq.;* 33 *Am. Jur., Libel and Slander,* §§ 124, 125; 53 *C. J. S. Libel and Slander* § 102 *et seq.;* 1 *Harper & James, The Law of Torts,* 419 *et seq.* (1956); *Odgers, Libel and Slander* (6th ed. 1929), 187.

Whether the privilege is available as a defense depends upon the circumstances of the particular case—the situation of the parties, the persons to whom, the circumstances under which, and the manner in which the communication was made. *Hartley v. Newark Morning Ledger Co.,* 134 *N. J. L.* 217, 221 (*E. & A.* 1946); *King v. Patterson,* 49 *N. J. L.* 417, 420 (*E. & A.* 1887). If the facts are not in dispute, it is the province of the court to determine whether a privilege existed and whether it was lost. If the facts are in dispute, the jury is called upon to consider those issues. *Coleman, supra* (29 *N. J.* at *page* 376); *Leers, supra* (24 *N. J.* at *page* 256); *Restatement, Torts,* § 619(1) and (2); *Prosser, supra,* 629. The burden of establishing privilege is on the defendant and, in the case of a conditional privilege, the burden of proving malice is on the plaintiff. *Coleman, supra* (29 *N. J.* at *pages* 373, 374). Newspapers possess a qualified or conditional privilege to report on public proceedings. *Prosser, supra,* 623–624; 53 *C. J. S. Libel and Slander* §§ 123–129, *pp.* 201–209; *Harper & James, supra,* 430–435; *Restatement, Torts,* § 611, 39 *Am. Jur.* 19. The statement in *Prosser, supra,* is illustrative (at *page* 623):

"5. *Reports of Public Proceedings.* Since it obviously is to the interest of the public that information be made available as to what takes place in public affairs, a qualified privilege is recognized under which a newspaper or anyone else may make such a

report to the public. The privilege rests upon the idea that any member of the public, if he were present, might see for himself, and the reporter is merely a substitute for the public eye. This privilege of reporting extends to all legislative proceedings, including the investigations of committees and the deliberations of municipal councils, and to the acts of executive or administrative officials of the national, state or municipal governments, including their official reports and communications. It extends also to the report of what takes place at any meeting open to the public."

The *Coleman* case supports this rule (29 *N. J.* at *page* 379):

"The rule given in the *Restatement, Torts,* § 611, is that the qualified privilege extends to the 'proceedings of a legislative or administrative body or an executive officer of the United States, a State or Territory thereof, or a municipal corporation or of a body empowered by law to perform a public duty,' although the publication contains false and defamatory matter, if it is (a) accurate and complete or a fair abridgment of such proceedings, and (b) not made solely for the purpose of causing harm to the person defamed; and it is there commented (a) that the privilege is lost 'if the report is published solely for the purpose of defaming the other and not for the purpose of informing the public,' and the privilege 'differs from the usual conditional privilege in that it affords protection even though the defamatory statement reported is known to be false.'"

See also similar statements in *Rogers, supra* (2 *N. J.* 402).

██ Defendant properly pleaded a privilege. On the basis of plaintiffs' own case, the trial court determined that a qualified privilege was established (see 53 *C. J. S. Libel and Slander* § 220, *p.* 332, and compare *Mannebach v. Stevens,* 71 *N. J. L.* 368 (*Sup. Ct.* 1904)) and with that determination we agree.

The nature of the "conference room" meeting is clearly established by the testimony of plaintiffs' witnesses. The conclusion is inescapable that it was not only an official but also a public meeting. Two resolutions by Brogan were introduced although not seconded. Brogan's actions were admittedly taken after an acrimonious official discussion with Fitzgerald, as Fitzgerald so testified. Fitzgerald's statements were in response to an official inquiry by two councilmen, his superiors, and his response was directed to that

question. Fitzgerald specifically testified that the Brogan resolutions were introduced at the conference room meeting. And these resolutions were recorded in the minutes of the city clerk. Thus, whether it was all one meeting or whether there was a separate "conference" afterwards, Fitzgerald's "defamatory" statements were made during the course of an official proceeding.

Fitzgerald's opinion that the meeting was not public is dissipated by his further testimony that at such meetings, for 20-odd years, members of the press had been admitted. This is sufficient proof of the public and official nature of the meeting.

The qualified privilege of defendant to publish was established on plaintiffs' own case. See 53 *C. J. S. Libel and Slander* § 220, *p.* 332, and compare *Mannebach v. Stevens,* 71 *N. J. L.* 368 (*Sup. Ct.* 1904). Thus, defendant was relieved of the burden of going forward with that defense.

As the defense of privilege thus appeared on plaintiffs' case, it was plaintiffs' burden to prove malice before they rested. Plaintiffs' evidence did not support any inference of malice. The fact that Fitzgerald's charges of insubordination against plaintiffs were referred to in the manner quoted in the nine news reports is not evidence of malice. The articles complained of constituted straight news reporting of Fitzgerald's statements and of actions by municipal council in official proceedings. The articles in nowise "commented" on the insubordination charges. The first article merely recited what was said at the meeting. And in the subsequent articles it was clearly proper to refer to Fitzgerald's statements as necessary background information for the interested public. The trial court properly concluded that there was no evidence of malice. It may be added that when the trial court announced its ruling, plaintiffs did not ask that the case be reopened to permit evidence on that issue.

Additionally, plaintiffs argue that as the majority of defendant's newspapers was distributed outside the City

of Clifton, this constituted excessive publication and thus defeated defendant's privilege. Before the trial court plaintiffs admitted that this issue had not been listed in the pretrial order but that it was encompassed under the stated general issue of defendant's privilege and of its sufficiency and availability. Whether we consider the issue of excessive publication as evidence tending to prove malice, *Schwarz Bros. Co. v. Evening News Pub. Co.,* 84 *N. J. L.* 486 (*Sup. Ct.* 1913); *Kruse v. Rabe,* 80 *N. J. L.* 378, 381 (*E. & A.* 1910), or as a separate issue, 53 *C. J. S. Libel and Slander* § 97, *p.* 154; *Prosser, supra,* 629, we find no evidence of excessive publication. A newspaper cannot be required to publish special editions for each community it serves. *Prosser, supra,* 627. Plaintiffs do not cite any relevant authority which supports this claim.

Judgment affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices BURLING, JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—7.

*For reversal*—None.