**FAIRBANKS PUBLISHING COMPANY,**
an Alaska corporation, Appellant,

v.

Grant **FRANCISCO**, Appellee.

No. 308.

Supreme Court of Alaska.

March 31, 1964.

786

Robert J. McNealy, Fairbanks, Daniel J. Riviera, Seattle, Wash., for appellant.

Robert A. Parrish, Millard F. Ingraham, Fairbanks, for appellee.

Before NESBETT, C. J., and DIMOND and AREND, JJ.

NESBETT, Chief Justice.

This appeal grows out of a libel suit commenced by appellee Grant Francisco against appellant publishing company which publishes a daily newspaper in Fairbanks, Alaska known as the Fairbanks Daily News-Miner. The libel is alleged to have been contained in an item published in the News-Miner on May 6, 1957 which was reporting the contents of a letter from the newly appointed Fairbanks Fire Chief to the City Manager of Fairbanks.

The questions raised by appellant are: (1) whether the news item was a fair and accurate abridgment of the privileged communication; (2) whether there was sufficient evidence of actual malice to justify submitting to the jury the question of punitive damages; (3) whether the plaintiff should have been permitted to testify concerning his financial condition and (4) whether the trial court should have permitted the plaintiff to use witnesses at the trial who were not named in the pre-trial order.

The publication of which Francisco complained was one of a series published by the News-Miner reporting a bitter controversy between the Fairbanks Fire Department and the City Manager which commenced prior to March 20, 1957 and continued through May of 1957.

In order to view the alleged libelous article in perspective it is necessary to review the News-Miner's reporting of the controversy from its beginning to the date of publication of the article in question.

By March 15, 1957 the dissatisfaction of the members of the Fairbanks Fire Department with what they considered to be the oppressive policies of the City Manager had become so great that, as a group, they caused a letter of protest to be written for presentation to the Fairbanks City Council. For some reason the letter was not present-ed to the council as originally intended. About five days after it had been written the letter came into the possession of the secretary of the Fairbanks Chamber of Commerce who apparently forwarded it to the City Council where it was considered on or about March 19, 1957. The letter reads as follows:

"DOES FAIRBANKS HAVE A CITY MANAGER OR A DICTATOR

Following is an Ad Paid by the Fairbanks Firemen's Benefit Fund

We as your Fire Department, as well as being individuals wish the facts known to you, Mr. & Mrs. Tax Payer.

Since Matt Slankard became City Manager, every Department in the City of Fairbanks has been in a constant seige of turmoil. Lately Mr. Slankard has been concentrating on the Fire Department. In all the years that Chief Woodcox has been on the job, he has never seen the Morale of the Department so low. Nothing he does or the Department does, pleases Mr. Slankard, and he is constantly belittling the Department on TV and Radio. Never one word of praise.

We are blamed for our outdated equipment being in constant repairs. Take the subject of the 1941 Seagrave truck that was purchased from the Army, which had fallen into the salt waters at Whittier prior to being bought by the City of Fairbanks, Chief Woodcox, in a letter to Mr. Slankard advised him that it would cost $5,000.00 to repair it, and even then, it would still be an old truck. Slankard would not listen, and went ahead and spent thousands of dollars in repairs, and then publically stated that he PERSONALLY saw that it was in excellent running condition. The pump still won't work, and is again in the City Garage torn down, which will cost additional tax money to repair. The pump will never work, due to corrosion caused by the salt water, which has eaten into the pump parts.

This Department is never given a chance to voice our opinions as to the equipment needed to run an efficient department. We do the best we can with what we have in way of equipment to do our job.

Memo after Memo is sent our Chief. Do this, Do that, without him (Slankard) first studying the subject for the betterment of all concerned. His last order was that all the Firemen are to wear their uniforms at all times. HAS HE FORGOTTEN THAT THE CITY DOES NOT BUY OUR UNIFORMS? Would it be practical for us to be dressed up, mopping floors, cleaning trucks, etc. A new employee is given a new uniform after he has been on the job three months, and that is paid from the Firemen's Benefit Fund. Slankard has issued some Rules and Regulations and included in these are orders that we cannot discuss Politics or Religion. Does that make sense? The Fire Hall is our home 24 hours at a stretch, and what we talk about as individuals is our business, not the City Managers. He now is drumming up the idea of making us all take written tests. Every Fire Department elsewhere except Fairbanks, has these tests given to them by their Chief. The ones Slankard is trying to make us take, pertains to Civil Service, and there are questions in the test that certainly do not pertain to our area. We are not Civil Service. We have no retirement system. Our Chief has had to fight for every raise we have been given; we fight to secure improvements to the hall to make it a more decent place in which to live. We even had to fight to secure the paint to clean it up.

Why doesn't Matt Slankard act like a City Manager, instead of dictating to the Department Heads? That isn't what Heads are for. A city can operate much more efficiently with all the Department Heads working under serene conditions and helpful suggestions. Instead of Mr. Slankard giving us a word of praise, we repeat again, he takes every opportunity to belittle us before the Public's eyes, and we repeat again, this constant seige of turmoil is tearing down the Morale of every Department in the City.

Another item of interest. Nearly all City Employees own or are buying their homes, pouring back into the City Coffers thousands of dollars. Most of them own their own automobiles. What does Slankard contribute to the City out of his immense salary? He doesn't even own a car, and you, Mr. & Mrs. Tax Payer are paying for all of this.

We insist that an investigation be made, not only to aid this Department but all the other Departments in the City of Fairbanks, and see why this dictatorship should exist.

Printed with my full sanction and approval /s/ E. B. Woodcox Chief Fairbanks Fire Dept."

(Followed by the signatures of 15 members of the Fairbanks Fire Department, including appellee Francisco.)

On March 20 the News-Miner carried a front page headline which read "FIRE DEPT. BLASTS CITY MANAGER" followed by leaders stating "Council Turns Matter Over to Slankard After Hearing Letter" and "Firemen's Letter Read at Meeting of Council; Members Decide that the 'Revolt' Is City Manager's Problem". In the lengthy report that followed, the effect of the letter was described as a "mutiny" by the Fairbanks Fire Department which fizzled and died when councilmen refused to intervene and left settlement of the "revolt" up to Slankard. Various portions of the letter were quoted along with statements made by various council members and the City Manager.

On March 21 in an editorial titled "NEWEST CITY DISPUTE" the News-

Miner reviewed the origin of the controversy and in paragraph three stated:

"The News-Miner doesn't intend to 'wade into' this unfortunate squabble, but we will give the background to the dispute for the benefit of our readers. After all, taxpayers have a stake in any city controversy."

On March 22 the News-Miner carried a front page item titled "CITY MANAGER DISMISSES CHIEF, THREE FIREMEN". The news item which followed reported that Fire Chief Woodcox and three other veteran members of the Fairbanks Fire Department had been asked for their resignations by City Manager Matt Slankard. The City Manager was quoted as saying that he felt that it was "in the best interests of the city in view of troubles which have arisen this week" to ask for their resignations. The article went on to discuss the possibility of two additional firemen being fired as a result of their "insubordination" in writing the letter to the council.

On March 23 the News-Miner carried an item on the controversy titled "Fire Chief, Men Tell About Their Dismissal". Beneath the leader was a picture of former Chief Woodcox surrounded by the three discharged firemen. In the article that accompanied the picture lengthy quotes from each of the firemen including the Chief were given outlining the personal views of each of the four firemen as to their side of the controversy.

On March 26 the News-Miner printed an editorial titled "THE CITY DISPUTE" which read as follows:

"In the current dispute that has resulted in the firing of four city firemen, the newspaper has endeavored to present facts, as best we could determine them.

"It has not been our intention in any way [sic] add fuel to the fires of controversy because of a dislike for any member of the city government. So far as we are concerned, Fairbanks would be much better off if we could keep our ship of municipal government on an even keel, and avoid the storms that periodically rock it wildly.

"As we see it, this trouble between the city manager and the fire department has been brewing for a long time. It appears to us that steps to end it should have been taken quite some time ago; also, we feel that the firing of four men on the grounds of 'insubordination' isn't exactly a satisfactory way to deal with complaints of men who have proven to be good public servants.

"Pinpointing the blame in this dispute is difficult, but we cannot see how the council can escape its responsibilities in the matter. Yes, the city manager is hired to operate the city government, but the council, as elected representatives of the people, has the overall responsibility to see that city government is conducted properly. If there has been a great deal of dissatisfaction in one department of the city government, the council should have investigated this matter.

"We are pleased to see that the council has finally decided to look into the situation. Maybe it isn't too late to prevent an injustice, if an injustice is involved here.

"We hope the council gets to the roots of the matter. The four men who were discharged were veterans of fire department service. They have families, and no doubt some of them were planning to make a career of fire department service.

"We owe it to all employees of the city to see to it that serving Fairbanks is not a hazardous occupation that offers the danger of being 'chopped off' the payroll on a few minutes notice to every worker who dares criticize the manner in which the local government is operated."

Also on March 26 the News-Miner in a front page headline stated "COUNCIL

SETS FIRE DEPT. PROBE" followed by leaders and a news item advising that a large group of citizens backed the former fire chief in the city dispute and that the council had decided to look into the charge that the City Manager had disregarded complaints of the dismissed fire chief and his department. Another news item of March 26 in the News-Miner advised that five city department heads at a meeting called that morning, which the editor of the News-Miner was invited to attend, stated that the purpose of the meeting was to state, once again, that they are solidly behind City Manager Matt Slankard in the current controversy. The item reported the views of various of the department heads to the effect that they had never had any trouble discussing problems with the City Manager, that the manager's leadership had been entirely adequate and that the firemen had forgotten about discipline and their obligations to superiors.

On May 3 the News-Miner, in an editorial titled "A Controversy That Persists", stated in part:

"Not even the arrival of spring, it sems, [sic] will bring an end to the persistent controversy that surrounds the city manager. This controversy was sparked off by the firing of four men from the city's fire department, and has smoldered ever since."

The editorial went on to mention that all engaged in the controversy were quite bitter, that the continued city upheaval was doing the town no good, that a committee appointed to look into the matter had so far uncovered nothing really conclusive. The editorial suggested that the committee redouble its efforts to get at the bottom of the controversy and bring the business to a head and pointed out that as a result of the dispute the city government seemed to be descending into a world of petty bickering, controversy, strife, low blows, trickery and a number of other things. It ended by stating that it was the duty of the City Council to move in and effect some sort of permanent settlement.

On May 6, 1957 the newly appointed Fire Chief Marvin L. Raaum addressed a letter to City Manager Slankard reading as follows:

" 'The Golden Heart of Alaska'

FAIRBANKS FIRE DEPARTMENT

Fairbanks, Alaska

'The Land of the Midnight Sun'

May 6, 1957

Mr. M. W. Slankard
City Manager
City of Fairbanks,
Alaska

Subject: Suspension from duty of Grant Francisco for an indefinite period of time

Dear Mr. Slankard:

On May 4th, at 5:00 p. m., I found it necessary to suspend Grant Francisco for an indefinite period of time for gross negligence while in line of duty. As pack pumps will be mentioned in this report, I would first like to mention that the Fire Department makes a practice, for fire prevention reasons, of burning dead grass on lots requested by various citizens of this city. In this type burning, pack pumps are the most necessary piece of equipment.

On May 4th fireman Grant Francisco and a relatively new fireman, Robert Hathan, were detailed to burn dead grass from various lots. At 1:00 p. m. they were combating a grass fire on Airport Road. At this time I equipped their truck with two new pack pumps which I had just borrowed from the Department of Forestry as our pack pumps on order had not arrived.

About 3:00 p. m. Grant Francisco allowed his truck to run ou(t) [sic] of gas while in the process of burning a lot in the one hundred block on First Avenue. This could have been an error. However, while his truck was out of gas, he, a supposedly experienced fireman and without the authority to

do so, gave permission to a citizen to burn the grass from the lot which was located about 200 feet from the truck.

Upon my arrival with spare gas for the truck, this lot began to blaze highly, as the grass was more than two feet high. It was then beginning to burn a fence on two sides of the lot. I asked him to take a pack pump over to the fire. He hung back and stated that there were no pack pumps on the truck. I asked him where the two new pack pumps were that I had equipped the truck with several hours previously. He stated that they weren't there now. Fireman Hothan [sic] then stated that there was an old pack pump on the truck. I asked him to take it to the fire and extinguish it, which he did. Later I learned that when going between lots that were being burned, he had stopped by the station and had set off the two new pack pumps.

I returned to the Fire Station and consulted with other officers of the department as to whether or not Francisco's actions had been deliberate. Our findings were that they very likely were. We decided he would be called into the office Monday morning for questioning. He was then ordered by radio, to return to the station.

About 4:45 p. m. I was getting into my car, which was parked alongside the fire station. I then saw Francisco leaving the station with the Seagraves headed for the City Garage to gas the truck. On a hunch, I decided to follow him. He kept using the lower gears, shifting back and forth and racing the engine very fast, far exceeding the maximum operational limits of the vehicle. Being familiar with the Seagraves, I would say that the tackometer was often in the 4,000 rpm range. Francisco and I had, just two days before, been instructed by a city garage mechanic that the maximum operating engine speed on the tackometer was

2,200 and that operating the engine at a higher speed would very quickly ruin the engine. His speed through the streets was often 30 miles per hour. He neglected to even slow down for at least three stop signs.

My suspicions were being confirmed that Francisco has been drawn into this current controversy to the extent that he has been asked by the group that was terminated from this department to, in some way, endanger the operational efficiency of this department and the good name that has been established this past six weeks. My suspicions were confirmed when I confronted Francisco at the City Garage with the above. He admitted that he had raced the engine of the Seagraves. Then he stated, 'I am not trying to hurt you, Marv. *I am just after one man*'.

Further background on the intentional wrecking of the Seagraves is that, under the supervision of the now terminated officers of the Fire Department when the Seagraves was continually breaking down and blame was being placed on the City Garage for not repairing it right and blame placed on the City Manager for not seeing that it was repaired right, is that there were continual statements by Jack Burnett implying that it was Woodcox's desire that everything possible be done to put the Seagraves out of commission. This included Jack Burnett ordering the driver of the Seagraves to drive at top speed to a fire in the College area. Upon arrival the engine was extremely overheated and although it would still run it would only pump water at very low pressure. The Seagraves made it back to the fire station under its own power and it was just a short time later that they succeeded in putting it completely out of commission. It then went to the city garage for a complete overhaul. I can, if desired, acquire signed statements under oath, confirming the above by

firemen on the department at the time this occurred. [sic]

It is evident that the men terminated from this department have no regard whatsoever, for the welfare of this department or for the safety of the citizens of this city. I would like to repeat my request that a court restraining order be sought restraining these men from their current activities which are so detrimental to this department.

I would like to include with this report that Inspector Hartwell has be [sic] devious means, been offered a very desirable position if he will accept the position and leave this department within ten days. He, of course, has turned the offer down. Grant Francisco has stated to members of this department he feels he is on borrowed time but if he finds it necessary to leave this department he has been offered a very good job and states it is much better than this one.

Respectfully submitted,

Marvin L. Raaum

Fire Chief

MLR:jr"

A copy of the above letter was delivered to the editor of the News-Miner about three hours before press deadline and on the same date the News-Miner printed the following item which is the basis for this action:

### "FIRE CHIEF ADDS FUEL TO THE FIRE

"Charges Ladd Chief Has Been Involved Here

"Fairbanks' civic controversy bubbled over again today, this time with newly appointed Fire Chief Marv Raaum turning on the gas.

"In separate letters today he:

"1. Charged that the Ladd AFB Fire Chief Ford has attempted to lure key personnel away from the reorganized City Fire Department.

"2. Charged that a current member of the force, who allegedly is in cahoots with the discharged members, has tried to sabotage city equipment.

"Raaum made the charges in letters, one of which he dispatched to the commanding officer of Ladd AFB, and the other to City Manager Matt Slankard.

#### "Attempted to Lure

"Specifically, Rauum [sic] charged that the Ladd chief attempted to lure the new city fire inspector from his job. Robert Hartwell, who succeeded Bob Murray, was alleged to have been called to Ford's home and offered a position at Ladd, providing he would take it on short notice.

"The city chief claimed that the Ladd AFB chief has used similar tactics on other members of the department. He alleged that the Ladd chief is in sympathy with members of the city department who were recently discharged.

#### "Suspicious Actions

"In his charges of sabotage, Chief Raaum named Grant Francisco, who was permanently fired from the force on May 4th.

"Raaum charged that Francisco, at the instigation of E. B. Woodcox and others who were discharged, had attempted to put a Seagraves fire engine out of commission.

"Raaum stated that first of all Francisco allowed the truck to run out of gas while dangerously close to a brush fire. Later, he drove the truck in a reckless manner, racing the engine beyond the safe maximum RPM.

"Raaum charged that these acts, together with other suspicious actions, indicate to him that Francisco desires to wreck fire department equipment."

Appellant's first point is that the trial court erred in not granting its request for judgment notwithstanding the verdict be-

cause the publication was made under a qualified or conditional privilege and there was no evidence that publication was made for the sole purpose of causing harm to appellee.

■ The law of defamation embodies the important public policy that individuals should generally be free to enjoy their reputations unimpaired by false and defamatory attacks. But there is a well established counter policy that in certain situations there is a paramount public interest permitting persons to speak or write freely without being restrained by the possibility of a defamation action.[1] In such situations the person writing or speaking is said to enjoy a privilege.

■ Two general types of privilege are recognized by the law. They are: absolute and conditional or qualified. On the ground that it is in the public interest to do so, judicial officers, attorneys, witnesses, jurors, legislators, government executive officers and others are accorded the absolute privilege of publishing false and defamatory matter within certain limitations.[2] Numerous conditional or qualified privileges are accorded based upon a public policy which recognizes that it is essential that true information shall be given whenever it is reasonably necessary for the protection of one's own interests, the interests of third persons, or the interests of the public. If such protection were not given, the fear of persons capable of supplying such information that they might have to

answer in damages would prevent its communication.[3] Each such privilege is conditional upon the existence of a state of facts which make it in the public interest to protect the person speaking or writing, even though an individual may be defamed as a result. If the conditional privilege is abused by the writer or speaker it is lost and he must answer for the legal consequences of his publication.

■■ In the case before us we are concerned with the conditional privilege accorded by law to newspapers to publish the report of a government official, even though the report may contain false and defamatory matter. This privilege is recognized because it is considered in the public interest that information be made available as to what takes place in public affairs. It is based upon the idea that any member of the public, if he were of a mind to, might inquire and determine the facts for himself—the reporter being merely a substitute for such individual effort.[4] The privilege is conditioned on the publication of an accurate and complete account of the contents of the report. If the report is not to be completely covered in the publication, then any abstract or abridgment of the report must be fair. The publication must not have been made solely for the purpose of causing harm to the person defamed.[5]

■ Here the report was in the form of a letter from Fire Chief Raaum to the City Manager reporting in the first para-

1. Swede v. Passaic Daily News, 30 N.J. 320, 153 A.2d 36, 42 (1959).

2. Restatement, Torts §§ 585–591 (1938).

3. See Restatement, Torts, Scope Note preceding § 593 (1938).

4. Swede v. Passaic Daily News, 30 N.J. 320, 153 A.2d 36, 43 (1959); Prosser, Torts 623 (2d ed. 1959).

5. Restatement, Torts § 611 (1938) which states:
"The publication of a report of judicial proceedings, or proceedings of a legislative or administrative body or an executive officer of the United States, a State or Territory thereof, or a municipal corporation or of a body empowered by law to perform a public duty is privileged, although it contains matter which is false and defamatory, if it is
"(a) accurate and complete or a fair abridgment of such proceedings, and
"(b) not made solely for the purpose of causing harm to the person defamed."
See Swede v. Passaic Daily News, supra note 4, 153 A.2d at 43; and Sciandra v. Lynett, 409 Pa. 595, 187 A.2d 586, 588–589 (1963), which approve and apply the rule of The Restatement, Torts § 611 (1938) without discussion.

graph that he had indefinitely suspended Francisco for gross negligence while in the line of duty. In the following 12 paragraphs the Chief stated his reasons for the suspension and expressed his suspicions concerning Francisco's motives. Since it was not disputed that the letter was an official report from one officer of the municipality to another officer of that municipality, the News-Miner publication covering the report was privileged if the condition for the existence of the privilege was satisfied, i. e., if the publication was a fair summary of the report. The question before us is whether the trial court should have ruled as a matter of law that the condition had been met and that the publication was privileged, as the News-Miner argues, or whether this was a question for the jury to determine from the evidence, as contended by Francisco.

Where the publication complained of is viewed in the light most favorable to the plaintiff and reasonable minds in the exercise of fair judgment could not differ on the question of whether the condition for the existence of the privilege was satisfied, but could only come to the conclusion that it had been, then it is the duty of the court to rule as a matter of law that the publication was privileged.[6] But if the facts are in dispute so that there is room for diversity of opinion among reasonable men as to whether the condition had been met, then the question as to the existence of the privilege should be submitted to the jury.[7]

This case was submitted to the jury along with 40 instructions, a special verdict form containing two interrogatories and forms of general verdict. The jury specifically found against the News-Miner on its defenses of truth and conditional privilege and awarded Francisco compensatory damages in the sum of $10,000 and punitive damages in the sum of $5,000.

Since the News-Miner contends on appeal that the article complained of was a summary of substantial accuracy and that the trial court should have so ruled, it becomes necessary for us to compare those portions of the news report which are claimed to have abused the privilege with the portions of the official report upon which they were based.

Paragraph numbered two of the news item stated:

"2. Charged that a current member of the force, who allegedly is in cahoots with the discharged members, has tried to sabotage city equipment."

Further along in the news item it was stated:

"In his charges of sabotage, Chief Raaum named Grant Francisco, who was permanently fired from the force on May 4th."

The words "cahoots" and "sabotage" do not appear in Raaum's letter. The question is whether, in abstracting the letter, the News-Miner employed words which, as commonly understood by the average person, distorted or exaggerated the meaning to the extent that it became an unfair abridgment.

"Cahoots" is defined as partnership, collusion.[8] Using that definition the average reader could have inferred that Francisco was charged with being in partnership with the group of firemen who had been terminated, or that he had acted in collusion with that group.

"Sabotage", as it is commonly understood, means "malicious waste or destruction of an employer's property by workmen, as during labor troubles".[9] Using this definition the average reader of the news item

---

6. Sciandra v. Lynett, 409 Pa. 595, 187 A. 2d 586, 592 (1963); Williams v. Standard-Examiner Pub. Co., 83 Utah 31, 27 P.2d 1 (1933).

7. Swede v. Passaic Daily News, 30 N.J. 320, 153 A.2d 36, 43 (1959).

8. Webster's New International Dictionary 374 (2d ed. 1960); City of Abilene v. Luhn, 65 S.W.2d 370, 371 (Tex.Civ.App. 1933).

9. Webster's New International Dictionary 2192 (2d ed. 1960); People v. Malley,

could have inferred that Raaum had charged that Francisco had acted to maliciously destroy the city's fire equipment.

The eighth paragraph of Raaum's letter stated:

My suspicions were being confirmed that Francisco has been drawn into this current controversy to the extent that he has been asked by the group that was terminated from this department to, in some way, endanger the operational efficiency of this department and the good name that has been established this past six weeks. My suspicions were confirmed when I confronted Francisco at the City Garage with the above. He admitted that he had raced the engine of the Seagraves. Then he stated, 'I am not trying to hurt you, Marv. *I am just after one man'*.

Preceding the above Raaum had explained in some detail how he had followed Francisco that day as he drove the Seagraves through town and had observed that he used the lower gears excessively, raced the engine far beyond its maximum operational limits and drove at an excessive rate of speed. Following the above quoted paragraph, Raaum stated in the report that under the supervision of the discharged firemen the Seagraves was intentionally and regularly operated in such a manner that it was continually being garaged for repairs, with the blame for inadequate repairs being placed on the City Manager and the garage on each occasion. One instance was related where the driver was ordered by one of the discharged firemen to drive the Seagraves at top speed to a fire, that it was so overheated upon its arrival at the fire that it could pump water only at low pressure. A short time later it was necessary to garage the machine for a complete overhaul. Raaum stated that he could obtain sworn statements from firemen confirming the above.

Following the above, Raaum stated:

"It is evident that the men terminated from this department have no regard whatsoever, for the welfare of this department or for the safety of the citizens of this city. I would like to repeat my request that a court restraining order be sought restraining these men from their current activities which are so detrimental to this department."

It appears to us that "cahoots" accurately describes the relationship which Raaum claimed existed between Francisco and the discharged firemen. Raaum said "My suspicions were being confirmed" that Francisco had been drawn into the dispute and that he had been asked by the group to endanger the operational efficiency of the department. He later stated, "My suspicions were confirmed" when Francisco was confronted "with the above" ; that he admitted he had raced the engine of the Seagraves and then stated "I am not trying to hurt you, Marv. *I am just after one man"*. Appellee argues that "cahoots" includes collusion, which implies an unsavory purpose. True, but this is exactly what Raaum was charging in his report.

It also appears that "sabotage" is an accurate abbreviated description of what Raaum was charging that Francisco had tried to do to city equipment. After describing in detail how he had observed Francisco abuse the Seagraves, Raaum reported that he confronted Francisco with the facts and that he admitted racing the engine and stated that he was just after one man. Interpreted in the context of the entire report, that one man could only have been the City Manager. The report definitely points out that racing the engine of the Seagraves would quickly ruin it; that former Fire Chief Woodcox was reported as desiring that everything possible be done to put the Seagraves out of commission in order to place blame on the City Manager.

49 Cal.App. 597, 194 P. 48, 54 (1920); See also State v. Moilen, 140 Minn. 112, 167 N.W. 345, 347–349, 1 A.L.R. 331

(1918); State v. McLennen, 116 Wash. 612, 200 P. 319 (1921).

In our opinion this portion of the report is susceptible of only one interpretation. That is that Francisco was acting in partnership or collusion with the discharged firemen; that he had tried to disable the city fire equipment and that by his own admission he had done this maliciously because he was "after" the City Manager

Whether Raaum's charges were true is a question we are not concerned with. The letter was a report of an official of municipal government submitted in the line of duty to his superior. It was in the public interest that the report be published. If the report was not embellished, distorted, exaggerated or rendered unfair by the manner of its abridgment, its publication was privileged. The court would have had to so rule as a matter of law.

█ The same ruling applies to the statement that Raaum had charged that Francisco was acting at the "instigation" of Woodcox and the other discharged firemen. Francisco argues that the word "instigation" does not appear in the report. This is true, but the report charged Woodcox and the other discharged firemen with responsibility for the commencement of the efforts at sabotage and for encouraging the continuance, asked that they be restrained by court order, stated that Francisco had "been asked by the group" to endanger the operational efficiency of the equipment and that he had responded to the request.

█ Our views are the same with respect to the last paragraph of the news item which stated in part, "Raaum charged that these acts, together with other suspicious actions. * * *" Appellee argues that no "other" suspicious actions were mentioned in Raaum's letter. It is plain from Raaum's report that he viewed Francisco's act of allowing the fire truck to run out of gas while parked in close proximity to burning grass as deliberate, even though he admitted that it could have been an error. Raaum was obviously suspicious. The

result of Francisco's acts could have caused the loss of fire equipment.

Last to be considered is that portion of the news item which stated, "who was permanently fired from the force on May 4th * * *", in referring to Francisco. Raaum's report stated, "On May 4th, at 5:00 p. m., I found it necessary to suspend Grant Francisco for an indefinite period of time * * *."

█ In order to acquire the privilege the News-Miner was not required to use the exact language contained in Raaum's report. A summary of substantial accuracy is sufficient.[10] The News-Miner argues that the above wording was substantially accurate. We believe that reasonable minds could differ as to whether "permanently fire" means substantially the same thing as an indefinite suspension and is a question which should have been decided by a jury.

In summary, the trial court should have ruled as a matter of law that all portions of the News-Miner article complained of, with the exception of the assertion that Francisco had been "permanently fired", were fair abridgments of Raaum's report. As to this assertion, the question of whether or not it was a fair and substantially accurate abridgment of the report should have been given to the jury to decide.

█ The conditional privilege would be abused and lost if the publication was made solely for the purpose of causing harm to Francisco. The question is whether this was an issue to be submitted to the jury for determination.

█ Here the evidence was clear and overwhelming that the news report was only one in a long series of publications that had regularly reported the developments of a matter of great public interest. Under these circumstances the court would have to accept as a fact that the publication had at least fulfilled the purpose for which the privilege is accorded, regardless of what-

10. Sciandra v. Lynett, 409 Pa. 595, 187 A.2d 586, 589 (1963).

ever other personal motives the publisher harbored. It would follow then that no jury could be justified in finding that the publication was made solely to harm Francisco. Under the facts of this case the judge had no alternative but to rule as a matter of law that the publication was not an abuse of the privilege insofar as the motives of the News-Miner were concerned.

■ The second question raised by appellant is whether the court was justified in submitting to the jury the question of punitive damages. In Fairbanks Publishing Company v. Pitka[11] we said that before punitive damages may be awarded actual malice must exist, and we defined actual malice as "ill will, enmity, hatred, spite or desire to injure the plaintiff in her fame, reputation or profession or to degrade, ridicule or disgrace her."

■ In the Pitka case, conditional privilege was not involved. Here we are concerned with conditional privilege, and are adopting the rule that if the publication complained of was a substantially accurate and fair abridgment of the report of a governmental official *and* was not made solely for the purpose of causing harm to the person defamed, there is no liability. Where this type of publication is concerned, the motives of the publisher are not to be determined in terms of degrees of malice. Punitive damages may be considered only if it is found that the sole reason for making the publication was to harm the person defamed. Since the court should have ruled as a matter of law that the publication was not an abuse of the privilege so far as the motives of the News-Miner were concerned, the jury could not consider the matter of awarding punitive damages.

■ On a retrial of this case the judge would first have to determine whether the assertion that Francisco was "permanently fired" was capable of a defama-

tory meaning.[12] If he found that it was, he would submit to the jury the question of whether such assertion was or was not a fair and substantially accurate abridgment of the corresponding portion of the report. The jury should be instructed that in making their determination they should not consider the news item as a whole, nor Raaum's report in its entirety, but only that portion of the news item submitted to them and the corresponding portion of Raaum's report. If the jury were to find that the assertion was not such a fair and substantially accurate abridgment, then they would have to determine whether the assertion was understood by those to whom it was communicated as being defamatory,[13] and if so, whether and to what extent Francisco was damaged by the defamation. The jury would not consider the News-Miner's motives in making the assertion, that is, whether or not actuated by actual malice; and therefore punitive damages would not be involved.

■ The next question is whether error was committed in permitting Francisco, over objection, to testify as to his financial condition at the time of publication.

After overruling timely objection the trial judge stated that he would discuss the matter with counsel at a later time. Francisco then testified that he was "pretty well broke"; that he owed debts at the time he was suspended from the fire department; that his wife had had a baby the month before; that he was unable to meet his bills and that unless he found a job within a month he was "dead".

After the noon recess and before court convened counsel for the News-Miner cited Perrine v. Winters[14] and Hartley v. Newark Morning Ledger Co.[15] and read portions of the latter case to the judge, asking that the testimony be stricken and the jury instructed that it had no relation to the lawsuit. The judge stated that he would al-

11. Opinion No. 99, 376 P.2d 190, 195 (Alaska 1962).

12. Restatement, Torts § 614(1) (1938).

13. Restatement, Torts § 614(2) (1938).

14. 73 Iowa 645, 35 N.W. 679 (1887).

15. 134 N.J.L. 217, 46 A.2d 777 (1946).

low the evidence to remain, at least until he had read the authorities further. At the close of the trial the judge overruled the motion to strike.

It was clear error to admit the testimony. Francisco's financial straits had no relevancy to the alleged libel. The evidence could in no way have assisted the jury in deciding the case on its merits. It may have had the effect of creating a sympathy in the jury and increasing the verdict.[16]

Lastly we consider whether the trial judge should have permitted counsel for Francisco to use three witnesses at the trial who were not named in the pre-trial order.

The order for pre-trial conference required both counsel to "exchange lists showing the names and addresses of all witnesses. * * *" The pre-trial order stated:

"Either party may call witnesses listed by the other. Witnesses not listed will be permitted to testify by the court where good cause of surprise, impeachment, privilege or impossibility be shown for withholding or delay in the designation thereof."

The order listed the names of all of the witnesses supplied by counsel for each of the parties.

Counsel for the News-Miner made timely objection during the trial to the use of any witness not named in the pre-trial order. Counsel for Francisco claimed that he had never approved or signed the pre-trial order and had never been served with a copy of it as far as he knew. He forcefully pointed out to the court that he did not believe in the theory that he should subject his witnesses to the pressures of the defense and that he did not intend to be denied the right to call his witnesses because of an order that was not served on him. As argument on the objection progressed and counsel for Francisco was faced with the facts, he admitted that he had furnished the list of witnesses for the

plaintiff contained in the pre-trial order, admitted that he had a copy of the pre-trial order in his file and admitted that he remembered being served with a copy by opposing counsel. His argument then was that the pre-trial judge had no authority to require the disclosure of any but expert witnesses and that a copy of the pre-trial order had not been served on him after the pre-trial judge had signed it. No motion was made asking permission to use the non-disclosed witnesses because of surprise, impeachment, privilege or impossibility as provided for in the pre-trial order.

Some statements made by Francisco's counsel during argument in chambers were admittedly untrue; his various positions in argument were often inconsistent; his attitude toward the court was uncooperative and his attitude toward opposing counsel was discourteous. The lack of cooperation of this counsel at other points in the trial are reflected in the record. On at least two occasions when requested to assist the court with some authority on questions of evidence raised by his own questioning of a witness, the court's requests were disregarded and on one occasion counsel simply responded with an unhelpful statement concerning "corporate newspapers who print any kind of inflammatory matter they can get their hands on for the sheer purpose of injuring the reputation of a little fellow who can't defend himself". The patience of the trial judge was on several occasions taxed to the limit under circumstances which warranted reprimand or discipline.

The trial judge finally ruled that both sides should be given the opportunity to call witnesses other than those named in the pre-trial order. The basis for the ruling is not clearly stated, but appears to be that since Civil Rule 16, providing for pre-trial procedure, does not specifically provide for the disclosure of the names of non-expert witnesses, the court did not have the authority to so require.

16. Hartley v. Newark Morning Ledger Co., supra note 15; Steinberger v. California Electric Garage Co., 176 Cal. 386, 168 P. 570 (1917).

■ Pre-trial procedure is intended to assist the trial judge by simplifying the issues, making necessary amendments to the pleadings, obtaining admissions, limiting the number of expert witnesses and considering and making a determination on any other matter that will aid in the fair and orderly disposition of the action.[17] The matters specifically mentioned in the rule are not exclusive.

■ A requirement that all parties disclose the names and addresses of all witnesses intended to be called works to the advantage of both sides in completing discovery proceedings, eliminating surprise and shortening the trial. The practice is commonly followed in the Federal courts [18] and is to be encouraged in the courts of this state.

■ Here the order permitted either side to call witnesses not listed upon a good cause showing of surprise, impeachment, privilege or impossibility for withholding or delay in designating the witnesses intended to be called. Counsel for Francisco admitted that he knew he would be calling several witnesses not named in the order for considerable periods of time prior to the commencement of the trial, but made no timely effort to disclose their names to the court and counsel for the News-Miner. Nor was any effort made to justify calling the witnesses based on the exceptions contained in the order. It was error for the trial judge to abandon the requirements of the pre-trial order under these circumstances.

Allowing both sides to call witnesses not named did not have the effect of equalizing the advantage of the parties. Counsel for the News-Miner claimed that he had in the first instance rendered full and good faith compliance with the order. Counsel for Francisco openly admitted that he had had no intention of disclosing the names of all of his witnesses if he could avoid it and that he had refused to approve the form of the pretrial order for undisclosed reasons, apparently in the belief that it would not be binding on him under those circumstances.

The judgment is reversed and the case is remanded for a new trial.

AREND, Justice (dissenting in part).

While I concur in the ultimate decision of the majority that the judgment must be reversed, I dissent from that portion of the opinion which holds that only the words "permanently fired," contained in the News-Miner article of May 6, 1957, should have been given to the jury for their determination as to whether or not the article was a fair and substantially accurate abridgment of the Raaum report.

In his amended complaint, the appellee Francisco alleged that the entire article, together with its title, "was false and untrue and defamatory and did constitute libel per se and did upon its face impute to the plaintiff [Francisco] conduct in contravention of his responsibilities and duties as a fireman employed by the City of Fairbanks, Alaska." In marked contrast to the piecemeal consideration given to these charges in the majority opinion, the defendant newspaper answered the complaint by denying the charges conjointly and alleging affirmatively that "the publication of May 6, 1957 * * * is a substantially accurate summarization and epitomization of the contents of the report filed by the chief of the Fairbanks Fire Department with the City Manager of Fairbanks."

As I read section 611 of Restatement, Torts, which we are adopting as a rule of law in this case, the newspaper article must be considered in its entirety on the question of whether or not it satisfies the occasion of privilege. I see no reasonable basis for dismembering the article and telling the jury that they may consider only selected portions thereof on the issue of conditional privilege. Such a tactic has the effect of producing a slanted picture for the jury and it could be just as detrimental to the

17. Civ.R. 16(a).

18. Goldberg v. Ann-Vien, Inc., 29 F.R.D. 6, 7 (N.D.Ga.1961).

cause of the defendant as to that of the plaintiff.

For the foregoing reasons, I conclude that on a retrial of this case the trial judge should first determine whether the News-Miner article, not just some selected portion thereof, was capable of a defamatory meaning. If he finds that it was, then he should submit to the jury the question of whether the article was or was not a fair and substantially accurate abridgment of the report.[1]

1. See Jones v. Pulitzer Pub. Co., 240 Mo. 200, 144 S.W. 441, 445 (1912); Lawyers Co-Operative Pub. Co. v. West Pub. Co., 32 App.Div. 585, 52 N.Y.S. 1120 (1898). Cf. also Atlas Sewing Centers, Inc. v. National Ass'n of Independent Sewing Machine Dealers, 260 F.2d 803, 808 (10th Cir. 1958); Bennett v. Seimiller, 175 Kan. 764, 267 P.2d 926, 929 (1954); Lancour v. Herald & Globe Ass'n, 111 Vt. 371, 17 A.2d 253, 257–258, 132 A.L.R. 486 (1941).