176 N.J. Super. 321 (1980)
423 A.2d 311
ROBERT E. REILLY, PLAINTIFF-RESPONDENT,
v.
PETER J. GILLEN, JR. AND PATRICIA GILLEN, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued November 3, 1980.
Decided November 25, 1980.
*323 Before Judges SEIDMAN, ANTELL and LANE.
Peter R. Bray argued the cause for appellants (Cole, Geaney, Yamner & Byrne, attorneys).
Jeffrey M. Garrod argued the cause for respondent (Orloff, Lowenbach, Stifelman & Siegel, attorneys).
The opinion of the court was delivered by ANTELL, J.A.D.
Defendants appeal from a judgment in libel after a jury verdict awarding plaintiff $5,000 compensatory damages jointly as to both defendants and $3,500 in punitive damages individually as to each defendant.
In the spring of 1977 plaintiff was running for reelection as councilman-at-large in the Township of West Milford. The election was held on May 10, 1977, and plaintiff received the lowest total of votes out of four candidates. On the Saturday before the election hand-addressed envelopes were mailed to an undetermined number of voters in which were contained two Xerox copies of an article which had appeared in the Paterson Morning Call in 1954. The article, with underlinings added by hand, read as follows:

*324 The Curtiss-Wright Corporation has filed a $50,000.00 suit in Hudson County Superior Court against Robert Reilly, of Macopin Rd., Newfoundland, and McDonough-Lydon Manufacturing Co., Inc. of Union City on charges of conspiracy and violation of the New Jersey Corruption of Employes Law.
The suit says that Reilly was employed in the manufacturing-engineering department of Wright Aeronautical Division where he acquired knowledge of Wright's needs for special packing material for parts of engines made for the Air Force.
Through his position with Wright, the Curtiss-Wright Corporation charges, Reilly assisted in preparing or prepared design[s] for packing in such a way that McDonough's product was specified as to exclude products of other suppliers. It is also alleged that, during this same time, Reilly received from McDonough-Lydon, and kept, commissions and other payments and became a director of McDonough, unknown to Curtiss-Wright and contrary to his duties and obligations.
The complaint also charges that the preparation of designs by Reilly, the specification of McDonough's product and the payments by McDonough to Reilly were the result of a conspiracy between them to assure the ever increasing use of McDonough's product and to the exclusion of competition. It is further charged that the conspiracy was carried on for the benefit of the defendants and to the detriment of Curtiss-Wright and eventually to the U.S. Government.
In addition to demanding payments for damages resulting from the conspiracy, Curtiss-Wright also demands an accounting of all monies paid by McDonough to Reilly and damages resulting from alleged violation of the New Jersey Corruption of Employes Law.
Reilly, a special process engineer and member of the Local 300 AUW-CIO, was discharged by Wright Aeronautical in September 21.
One copy of the article was enlarged and underlined as indicated above; the other copy duplicated the original size and was not underlined. Of critical importance herein is that the mailing failed to indicate that ultimately the complaint was voluntarily dismissed, that plaintiff was exonerated and eventually invited to return to his employment with Wright-Aeronautical. Moreover, the article contained factual errors in that plaintiff was neither an engineer nor was he involved in packaging. In addition, the complaint did not allege that plaintiff's conduct was detrimental to the United States Government.
The evidence abundantly supports the conclusion that defendants were responsible for the mailing. Mr. Gillen admitted planning, since February 1977, to distribute the article a few days before the election along with a letter addressed to the issues in the campaign. He further conceded that he was the *325 one who underlined the words on the enlarged copy of the article. He was also aware that the article said nothing about plaintiff's subsequent vindication and that the timing of the planned distribution would preclude any rebuttal by plaintiff. Despite the foregoing concessions, defendant denied actually disseminating the article. However, a handwriting expert testified that the address on one of the envelopes containing the article matched a sample of Gillen's handwriting, and that the addresses on five other envelopes matched the handwriting of a sample of Mrs. Gillen's handwriting. Furthermore, two other candidates in the May 1977 election testified that Gillen had approached them about his plan and that they had advised him against it.
Plaintiff had personal knowledge of at least 300 voters who had received the mailing. He was able to document 55 who had given him their envelopes. According to plaintiff and witnesses he produced, the general reaction of the community was surprise and disappointment at what was perceived as plaintiff's dishonest and unpatriotic conduct. He and his family were socially ostracized and he was forced to discontinue certain valued associations. As a further result he sold his home and moved from the township in September 1978.
Plaintiff attributed the tactic to defendant Peter Gillen's desire for political revenge. In 1975, when plaintiff and Gillen were fellow councilmen, Gillen threatened to "get" plaintiff when he failed to vote for Gillen's choice for township attorney and again when plaintiff did not support Gillen's position on a zoning matter.
Any question about Peter Gillen's knowledge of the misleading and untrue character of the article is dispelled by the fact that earlier in 1975, when the two were still political allies, the circumstances of the 1954 incident involving Curtis-Wright were disclosed to Gillen. Gillen had questioned plaintiff concerning the matter and after plaintiff explained how he had been fully exonerated of wrongdoing Gillen indicated that he was satisfied.
*326 Defendants argue that the trial judge erred in ruling that the truth of the alleged libel must be assessed as of the time of the republication in 1977, rather than in 1954 when the article appeared in the newspaper. Specifically, they challenge the judge's decision to permit plaintiff to prove his vindication in the 1954 civil action, and to let the jury consider that vindication in weighing the truth of the 1977 publication. They also protest the trial judge's denial of their post-trial motions on this ground.
In his written decision responding to defendants' motion for summary judgment, the judge ruled that "the veracity of the alleged defamatory statement must be evaluated as of the time of alleged publication by the defendant in this case, i.e., 1977." (Emphasis in original). Thus he maintained that whether the 1954 article accurately reported the contents of the complaint was irrelevant; rather, at issue was whether "events which occurred subsequent to the original newspaper publication altered the meaning of the admittedly true statement." (Emphasis in original). The court added that defendants' underlining of the words "corruption" and "U.S. Government" might properly be construed by the jury as affecting the truth of the 1977 republication.
In accordance with the foregoing, plaintiff testified at the trial to the dismissal of the suit, the invitation to resume his employment and the apology given him by plaintiffs in that action. In his jury charge the trial judge said that in deciding the truth issue, the jury could consider whether "modifications" "changed the fair import, the fair meaning of the statement." The judge also used the following language, specifically protested by defendants on appeal:
Additionally, in considering this issue all of the information that the defendants had, additional knowledge of and which you find in fact that they had, this additional knowledge can be considered by you in evaluating the issue presented.
The thrust of defendants' argument is, in effect, "once true, always true," noting that since the article accurately reported the 1954 allegations, its publication was as privileged in 1977 as *327 it was in 1954. They claim they were not obliged to report plaintiff's vindication because the article did not address the ultimate disposition of the complaint.
Preliminarily, there is a question as to defendants' premise that the 1954 article was true. Plaintiff testified, and defendants concede, that the described complaint did not, as the article stated, charge plaintiff with conduct detrimental to the United States. Although defendants characterize this as a minor, insubstantial misstatement, we think it went to the "gist or sting" of the libel. Cf. La Rocca v. New York News, Inc., 156 N.J. Super. 59, 63 (App.Div. 1978). Indeed, one defamatory meaning alleged by plaintiff was that he was unpatriotic. Regardless, we address the issue of whether an article true when published may nevertheless be libelous if knowingly republished without reference to intervening events establishing that the factual allegations originally recounted were false.
Reports of judicial proceedings are subject to a qualified privilege. "A full, fair and accurate report of a judicial proceeding is qualifiedly privileged, although the report contains matters that would otherwise be defamatory and actionable, and no action will lie therefor except on proof of malice in making it." Rogers v. Courier Post Co., 2 N.J. 393, 402 (1949). Accord, Swede v. Passaic Daily News, 30 N.J. 320, 332 (1959); Dijkstra v. Westerink, 168 N.J. Super. 128, 136 (App.Div. 1979), certif. den. 81 N.J. 329 (1979). But the truth of an alleged libel must be measured "as of the time of the defamatory publication." Restatement, Torts 2d, Comment (g) to § 581A at 237 (1977). In 1977 the 23-year-old article was not "fair and accurate" because of Gillen's failure to report the ultimate disposition of the charge. As republished, the article's unmistakable import was that plaintiff was guilty of wrongdoing, an insinuation which lay beyond the privilege whether we call it a false statement or a distorted account. Bock v. Plainfield Courier-News, 45 N.J. Super. 302, 307 (App.Div. 1957).

*328 ... [T]he publication, to come within the privilege, must be full and accurate or the immunity is lost; if the report is garbled or fragmentary to the point where a false imputation is made about the plaintiff which would not be present had a full and accurate report been made, the publisher is subject to liability. Of course, it is not necessary that the entire proceedings be reproduced in their every detail. It is enough that the essential and important features be included, in so far as they are pertinent to the defamatory matter, and that they be substantially accurate. [1 Harper and James, The Law of Torts (1956), § 5.24 at 432]
Section 611 of the Restatement, Torts 2d, supra reads as follows:
The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported.
Comment (f) cautions:
Not only must the report be accurate, but it must be fair. Even a report that is accurate so far as it goes may be so edited and deleted as to misrepresent the proceeding and thus be misleading. Thus, although it is unnecessary that the report be exhaustive and complete, it is necessary that nothing be omitted or misplaced in such a manner as to convey an erroneous impression to those who hear or read it, as for example a report of the discreditable testimony in a judicial proceeding and a failure to publish the exculpatory evidence....
The trial judge correctly perceived that a report which is true when made may be defamatory if repeated under circumstances different from those surrounding the original publication, and the jury was properly permitted to assess the truth thereof in light of the facts as they were known at the time of republication.
Finally, the privilege fails because of the malicious motives which Peter Gillen virtually admitted. Regardless of any privilege the original publication might have enjoyed, it can be nullified by the malicious motive of the republisher. Trautwein v. Harbourt, 40 N.J. Super. 247, 263-264 (App.Div. 1956), certif. den. 22 N.J. 220 (1956). "The qualified privilege affords protection only if there is no ill motive or malice in fact." Swede v. Passaic Daily News, supra at 332. Gillen's motive was not to communicate information of public interest, the only legitimate basis of the privilege, but rather to cripple plaintiff's reelection chances.
*329 The foregoing views have application only to the judgment as to Peter Gillen. As to Patricia Gillen we are unable to discern sufficient credible evidence in the record to support the jury's finding of actual malice. Nowhere was she shown to have known of the article's untrue and defamatory character. The evidence demonstrates only that Peter Gillen possessed this information, but not that he shared it with his wife. We realize that evidence relating thereto lies peculiarly within the knowledge of the defendants, that Patricia Gillen did not testify, and that communications between the Gillens were excluded from evidence under the marital privilege, Evid.R. 28. But adverse inferences from the exercise thereof may not be drawn. Evid.R. 39.
We have considered defendant Peter Gillen's other contentions and find them to be completely without merit. R. 2:11-3(e)(1)(E).
As to defendant Patricia Gillen the judgment is reversed and the complaint dismissed. In all other respects the judgment is affirmed.