643 A.2d 1012

JAMES COSTELLO, PLAINTIFF–APPELLANT, v. OCEAN COUNTY OBSERVER, WHIT ANDREWS AND JOHN DOE, A FICTITIOUSLY NAMED DEFENDANT, DEFENDANTS–RESPONDENTS.

Argued March 14, 1994—Decided July 20, 1994.

596

Content is fully redacted.

598

*David B. Rubin* argued the cause for appellant (*Rubin, Rubin, Malgran, Kaplan & Kuhn,* attorneys).

*Gregory M. Harvey,* a member of the Pennsylvania bar, argued the cause for respondent (*Starkey, Kelly, Blaney & White,* attorneys; *Therese A. Nestor,* of counsel).

The opinion of the Court was delivered by

GARIBALDI, J.

This case involves a newspaper article describing allegations contained in an unfiled complaint that a police lieutenant fondled a woman while she was handcuffed during a strip-search. We address whether the fair-report privilege applies and whether the lieutenant is a public figure subject to the actual-malice burden of proof.

I

In October 1990 Joseph Fisher, a supervising editor at the *Ocean County Observer,* assigned reporter Whit Andrews to inves-

tigate reports of possible misconduct by certain Seaside Heights police officers. Andrews, a 1989 college graduate, began working for the newspaper in April 1990. Fisher gave Andrews a docket number and told him to determine whether a "notice of claim" had been filed. After Andrews made several trips to the courthouse, on November 7, 1990, a judge's law clerk permitted Andrews to inspect a file with the specified docket number, titled *Nicholas J. Guiliano v. Borough of Seaside Heights and James Magovern, III.*

The file contained a *pro se* Order to Show Cause and an affidavit of Guiliano with several attached exhibits. In the Order, Guiliano complained that he had been arbitrarily denied discovery in connection with pending disorderly-conduct and obstructing-justice complaints filed against him in the Municipal Court of the Borough of Seaside Heights, that were scheduled for trial on August 14, 1990. Specifically, Guiliano sought the employment records of Patrolman Magovern from the Borough. Guiliano's affidavit stated that on May 17, 1988, Patrolman Magovern had gone to Guiliano's home "with reference to a window of a neighboring building being broken," and had arrested Guiliano's female acquaintance, Elizabeth Fesl. Officer Magovern issued a summons at that time to Fesl for disorderly conduct and obstructing justice. Four months later, the police also issued a summons to Guiliano for obstruction of justice in connection with that incident.

Paragraphs 8 and 9 of Guiliano's affidavit state:

8. On or about sometime in January 1989, a Notice of Tort Claim was filed with the attorneys[ ] for the Borough and copied to the Defendants in the *proposed civil action.* A true and exact copy is attached hereunto as Exhibit "E".

9. Sometime subsequent a general form of release was entered into by all parties with the exception of Patrolman Magovern.

[Emphasis added.]

Although the affidavit described Exhibit E as a Notice of Tort Claim, the exhibit was actually a typewritten, unsigned, unfiled seventy-four page federal court complaint with 257 paragraphs, which had "DRAFT" stamped on it. In the complaint, Guiliano and Fesl assert claims against Seaside Heights and many of its

police officers, including Lieutenant Costello. According to the complaint, Costello conducted an unlawful search of Fesl after she was arrested. The complaint states:

111. On May 17, 1988, Plaintiff was unlawfully arrested in the Borough of Seaside Heights, New Jersey and was physically taken to the Seaside Heights Municipal jail. Defendant–Costello took Plaintiff–Fesl to a separate room and she was told by Defendant–Costello that Costello, personally, would do a bodily search for contraband.

112. Plaintiff–Fesl refused and while handcuffed, Defendant–Costello pulled down the Plaintiff–Fesl's blouse, already somewhat open, and instructed to Fesl to bend over so that he may "frisk" her for weapons and or contraband.

113. When she duly refused, Defendant–Costello, forcibly bent her over and proceeded to search and "feel up" the Plaintiff–Fesl's genital and anal areas. Defendant–Costello also at this time fondled and breached the Plaintiff–Fesl's breasts, all while Fesl was still handcuffed.

114. When Fesl responded that this was blatantly illegal and illegitimate, Costello replied, "what's the matter don't you like it."

The draft complaint involved a separate action from the Order to Show Cause, as evidenced by the different captions. The draft complaint named Guiliano and Fesl as plaintiffs, but the Order to Show Cause named only Guiliano. Fesl was not a party in the Order to Show Cause proceeding, and the file that Andrews consulted did not contain any affidavits or statements from her.

At his deposition, Andrews said that he did not know the meaning of an Order to Show Cause, did not understand the relationship of the attached exhibits to the Order to Show Cause, and did not know the status of the matter. He also claimed to be unaware that the Order to Show Cause had been returnable September 14, 1990, approximately six weeks before his visit. Andrews does claim, however, that he attempted to contact sources regarding the allegations contained in the draft complaint.

Andrews allegedly tried to communicate with Lieutenant Costello, Officer Magovern, and other Borough officials on the day he inspected the file, without success. He did not attempt to communicate with Fesl or Guiliano. On the next day, November 8, 1990, Andrews telephoned the Borough's attorney, Ronald Hoffman, and told Hoffman that in the Guiliano file he had found a copy of a very lengthy proposed complaint arising out of the May 17, 1988,

incident. He specifically mentioned the allegation against Costello and stated his intention to write a story describing Costello's alleged improprieties. Hoffman had two conversations with Andrews that day. He prepared a file memo that afternoon memorializing his telephone conversations with Andrews.

The first conversation occurred at 1:00 p.m. At that time, Hoffman could recall only that complaints from the May 17, 1988, incident were pending in municipal court. However, he specifically informed Andrews of the following regarding Costello:

> I indicated that I had no knowledge of that allegation [Costello's alleged search of Fesl] and further indicated that, to the best of my knowledge, there were no indictable criminal complaints, municipal court criminal complaints or complaints of a disciplinary nature with the Seaside Heights Police Department involving that allegation. I indicated that that information was totally new to me and I knew nothing about it.

Andrews told Hoffman that he intended to publish the alleged improprieties of Costello. Hoffman then related:

> I cautioned Mr. Andrews regarding the possibility of libel/slander. I indicated to him that I was certain that the Observer [sic] had an attorney on staff and that perhaps it would be a good idea to review the contents of the story with said attorney prior to publishing same in the newspaper. Mr. Andrews responded by saying that they were on a very tight budget, had no attorney on staff and were anxious to have the story printed so that they could get the story into print prior to the Asbury Park Press getting the story. He indicated that he would run the proposed story by his editor prior to the printing. I indicated that I would call him back later in the afternoon and advise him whether the Borough had any comment.

Hoffman called Andrews at 4:00 p.m. that day. According to Hoffman's file memo,

> I also indicated that the [police] reports and [witness] statement made no reference to Lieutenant Costello. Mr. Andrews agreed. We also commented that the arrest report had Sergeant Tate as the officer in charge at the time the incident took place rather than Lieutenant Costello. It was confirmed that there were no complaints either way involving Lieutenant Costello, particularly of a sexual abuse nature. It was further agreed that the lengthy pleading prepared by Mr. Guiliano had not been filed with any court and that the statute of limitations regarding the allegations contained therein had run. I terminated my conversation with Mr. Andrews and was then advised by William T. Hiering, Jr. that, while I was at my deposition, Andrews had called leaving a message that he had reviewed this matter with his editor and that the story was going to go to print whether we got back to him or not.

Andrews' story appeared in the November 9, 1990, edition of the *Ocean County Observer*. The front page of the *Observer* contained the caption, "Woman alleges brutality," and referred readers to page A3. The headline on page A3, written by one of Andrews' editors, read, "Complaint alleges Seaside cop fondled woman." The article stated in part:

> A Lakehurst woman is alleging she was handcuffed, beaten and improperly strip-searched by police officers in a May 1988 incident here.
>
> Elizabeth Fesl claims in papers filed in state Superior Court that she was smashed into a brick wall and that a male police lieutenant illegally fondled her breast and genitalia because she broke a window.
>
> The police report from the incident and a witness' account claim that Fesl attacked the police officer and that he only defended himself and used acceptable force to subdue her.
>
> The claim is one of a series of complaints and notices of intent to sue against the borough's Police Department, which has come under fire in recent months from people alleging police brutality.
>
> The strip-search allegations are not addressed in the arrest report.
>
> According to the court papers, Patrolman James Magovern, III and two other officers were called to a scene of a fight between Fesl and her sister at about 2:30 a.m. May 17, 1990 [sic].
>
> The claim following the incident was filed by Nicholas Guiliano, a borough resident, on the woman's behalf. The claim is a notice of intent to sue in the U.S. District Court on the grounds of deprivation of civil rights.
>
> The claim also has been filed as an exhibit in Guiliano's request for a Superior Court order to demand some of Magovern's employment records from the borough.
>
> Seaside Heights Borough Attorney Ronald E. Hoffman had no comment when asked about the notice of intent or pending litigation.

> \* \* \* \* \* \* \* \*

> When Fesl got to the police station, the claim says, Lt. James Costello forced her to bend over and "proceeded to search and 'feel up' the Plaintiff–Fesl's genital and anal areas ... [he] fondled and breached the Plaintiff–Fesl's breasts, all while Fesl was still handcuffed."
>
> "When Fesl responded that this was blatantly illegal and illegitimate," the claim says, Costello replied, "What's the matter, don't you like it?"

> \* \* \* \* \* \* \* \*

> No complaints were signed against Costello in connection with the incident, however, despite a lengthy sheet of charges Guiliano and Fesl filed against Magovern.

A reprint of the entire article appears in the appendix of this opinion.

On March 12, 1991, Costello sued Andrews and the *Observer* for defamation. Costello argues that the article erroneously states or implies that Fesl was asserting a complaint against him. Identifying a possible motive for the negative story, Costello noted that the Seaside Heights Police had arrested Andrews' editor, Fisher, for driving while intoxicated in the previous year, which had resulted in suspension of Fisher's driver's license. Defendants argue that no proof of Fisher's conviction is on record; plaintiff claims he did not produce record proof because the issue was not in dispute.

On August 4, 1992, defendants filed a motion for summary judgment on the ground that the article was protected by the fair-report privilege and that Costello had failed to establish actual malice in the writing and publication of the article. Costello filed a cross-motion for partial summary judgment on the ground that the story was defamatory *per se*. He also asked the court to strike the fair-report privilege as a matter of law.

The trial court denied both parties' motions for summary judgment. In an unpublished opinion, the Appellate Division reversed and remanded for entry of summary judgment in favor of defendants, concluding that the fair-report privilege applied and that Costello had failed to establish actual malice by clear and convincing evidence. We granted certification, 134 *N.J.* 559, 636 *A.*2d 518 (1993).

## II

"[T]he fear of [being sued for libel] can inhibit comment on matters of public concern." *Dairy Stores, Inc. v. Sentinel Publishing Co.*, 104 *N.J.* 125, 157, 516 *A.*2d 220 (1986). Summary judgment is therefore an important tool for disposing of non-meritorious libel lawsuits. A court may enter summary judgment only if "there is no genuine issue as to any material fact ... [and] the moving party is entitled to a judgment or order as a matter of

law." *R.* 4:46–2. In our review of the defendants' summary-judgment motion, "we view the facts in the light most favorable to the plaintiff, giving [plaintiff] the benefit of all favorable inferences that may legitimately be drawn from the record." *Dairy Stores, supra,* 104 *N.J.* at 135, 516 *A.*2d 220.

 We begin our analysis by determining whether the fair-report privilege protects defendants from liability. We first consider the policies underlying both the law of defamation and the law of privilege. "The law of defamation embodies the important public policy that individuals should generally be free to enjoy their reputations unimpaired by false and defamatory attacks." *Swede v. Passaic Daily News,* 30 *N.J.* 320, 331, 153 *A.*2d 36 (1959). Privileges that restrict recovery for defamation reflect the competing "paramount public interest [in] permitting persons to speak or write freely without being restrained by the possibility of a defamation action." *Ibid.* They are "designed to protect speech in those narrowly defined instances in which the public interest in unrestrained communication outweighs the right of redress." *Fees v. Trow,* 105 *N.J.* 330, 336, 521 *A.*2d 824 (1987); *see also Erickson v. Marsh & McLennan Co.,* 117 *N.J.* 539, 564, 569 *A.*2d 793 (1990) (stating that qualified privileges exist because "the legitimate public or private interest underlying the publication outweighs the important reputation interests of the individual").

 Generally, the law of defamation provides redress against a party that reprints defamatory statements. A claim that "information [was] obtained from another source will not relieve [defendants] of liability." *Lawrence v. Bauer Publishing & Printing Ltd.,* 89 *N.J.* 451, 461, 446 *A.*2d 469, *cert. denied,* 459 *U.S.* 999, 103 *S.Ct.* 358, 74 *L.Ed.*2d 395 (1982). In most instances, therefore, to republish a defamatory statement, the reporter or newspaper must verify that a statement was spoken, and also that the substance of the statement is true. *Ibid.* The fair-report privilege is an exception to the general rule that imposes liability for republication of a defamatory statement. *Swede, supra,* 30 *N.J.* at

332–33, 153 *A.*2d 36; *Rogers v. Courier Post Co.*, 2 *N.J.* 393, 402, 66 *A.*2d 869 (1949).

The fair-report privilege's purpose is "to assure that people who report on official releases about public concerns will not be held responsible for the contents of the reports." *Schiavone Constr. Co. v. Time, Inc.*, 847 *F.*2d 1069, 1085 (3d Cir.1988). The privilege applies to reports of defamatory statements made in judicial and other official proceedings. Protection for such republication furthers the public interest "that information be made available as to what takes place in certain kinds of judicial, legislative, and other public proceedings." *Prosser and Keeton on Torts* § 115 (5th ed. 1984). The underlying rationale is that "any member of the public, if he were present, might see and hear for himself [statements made at a public proceeding], so that the reporter is merely a substitute for the public eye." *Ibid.* In *Rogers, supra*, 2 *N.J.* at 402, 66 *A.*2d 869, we defined the fair-report privilege as follows: "[a] full, fair and accurate report of a judicial proceeding is qualifiedly privileged, although the report contains matters that would otherwise be defamatory and actionable, and no action will lie therefor except on proof of malice in making it."

For the privilege to apply, the court must first determine whether the report is a full, fair, and accurate account of the official proceeding. *See Bock v. Plainfield Courier-News*, 45 *N.J.Super.* 302, 307, 132 *A.*2d 523 (App.Div.1957). The determination of whether a report is fair and accurate is an objective one. *Restatement (Second) of Torts*, § 611 comment f (1976) (providing that report of public proceedings should not convey erroneous impression to those who read or hear it). However, for the privilege to apply, "[i]t is not necessary that [the account] be exact in every immaterial detail.... It is enough that it conveys to the persons who read it a substantially correct account of the [contents of the official document]." *Ibid.* Thus, the fair-report privilege provides protection even though an article may not be accurate in every conceivable aspect.

In addition to being accurate, a report must also be fair. A report that is accurate may not be edited and deleted in a way that renders its contents misleading. Fairness requires that although the report need not be exhaustive, "it is necessary that nothing be omitted or misplaced in such a manner as to convey an erroneous impression to those who hear or read it...." *Ibid.* Although a reporter is allowed to make factual errors and omissions, the fair-report privilege will not protect a story if the errors and omissions mislead readers.

The case law that addresses the fair-report privilege is sparse but instructive. In *Reilly v. Gillen*, 176 *N.J.Super.* 321, 423 *A.*2d 311 (App.Div.1980), the defendant had published a twenty-three-year-old news article that described a corporation's lawsuit against one of its employees for defrauding the company. The article failed to state that the complaint had been voluntarily dismissed and that plaintiff had been permitted to return to work at the company. The court held that the "truth of an alleged libel must be measured 'as of the time of the defamatory publication.' " *Id.* at 327, 423 *A.*2d 311 (quoting *Restatement (Second) of Torts, supra,* § 581A comment g). The Appellate Division concluded that the privilege did not apply because by failing to explain the case's ultimate disposition, the article erroneously insinuated that plaintiff was guilty of wrongdoing. *Ibid.*

Likewise, a reasonable reader of the *Observer* article would conclude that Fesl was actively pursuing her harassment claim against Officer Costello, although Ms. Fesl had not filed the complaint. The use of the present tense in the headline and opening paragraphs indicate a pending action: "Complaint *alleges* Seaside cop fondled woman," "A Lakehurst woman *is alleging,*" "Fesl *claims* in papers filed in Superior Court," "The claim *is* one of a series of complaints." In addition, although the article states that "no complaints have been signed" against Officer Costello, it also states that "[t]he claim ... *was filed* by Nicholas Guiliano ... on the woman's behalf." (Emphasis added.)

The article is not an accurate report of a judicial proceeding, because a reader who reviews the entire article receives conflicting information regarding the status of the matter; the article is internally inconsistent, misleading, and confusing. The story gives the overall impression that litigation against Costello concerning Fesl's claim is pending. The "corrective" statements (that no complaint had been signed, etc.) are unsuccessful in making the story less misleading. Such confusing news coverage does not serve the legitimate public interest of accurately informing readers about official proceedings.

*Schiavone, supra,* 847 *F*.2d at 1087, illustrates that an article must be not only accurate but also fair for the privilege to apply. In that case, the Third Circuit applied New Jersey law and found that the fair-report privilege did not apply to an article that was based on a confidential memorandum of a former FBI chief that mentioned the plaintiff's name several times in connection with the disappearance of former teamsters' union boss Jimmy Hoffa. *Id.* at 1089. The article accurately stated that the plaintiff's name had been mentioned in connection with the disappearance of Hoffa. But, as in *Reilly,* it failed to mention a significant fact: the memo had stated that the appearance of the plaintiff's name did not suggest any criminality or organized-crime associations. *Id.* at 1072. The court found that *"Time'*s omission presents a clear example of an unfair report that does not deserve the qualified privilege to reproduce a libel." *Id.* at 1088.

Likewise, the *Observer* article's omission of significant facts causes the account to be misleading and unfair. For example, Andrews failed to report that Exhibit E was a complaint that had never been filed; that the pending Superior Court matter was Guiliano's case; that neither Fesl or Costello were parties to that action; and that at the time the article was published, Costello was legally immune from any claim that Fesl could have asserted.

More importantly, the article, and especially its headline, make Officer Costello the focus of the court proceeding. The emphasis of the article is that Fesl is suing Officer Costello for the violation

of her civil rights in strip-searching her and that her allegations were part of the overall investigation into police brutality by the Seaside Heights police department. Neither of those assertions is true. Guiliano's *pro se* Order to Show Cause sought records from the Borough regarding Officer Magovern, not Lieutenant Costello. Furthermore, Guiliano's affidavit stated that "a general form of release was entered into by all parties with the exception of Patrolman Magovern." The draft complaint annexed to Guiliano's affidavit therefore was relevant to the pending judicial proceeding only to the extent that it involved Officer Magovern.

Nonetheless, defendants seek to invoke the fair-report privilege for an article focusing on Officer Costello, not Officer Magovern. The limited judicial proceeding, a pretrial discovery motion for information for police records, does not concern Officer Costello. Yet, the article portrays Officer Costello in a most offensive and sensational way—a policeman who unjustifiably strip-searches women. Such a portrayal surely will draw the public's attention and sell papers. The portrayal, however, is highly unfair to Officer Costello and is an inaccurate representation of the court proceeding in which Guiliano filed the Order to Show Cause. Indeed, Officer Costello was not even a party to that pending proceeding.

The article fails to meet the fair-report privilege's purpose, to be the eyes and ears for those who could have reviewed but chose not to review the matters on public record themselves. The privilege does not give newspapers license to garble the facts. "The news story may be lively and filled with human interest, but in all matters [that] materially affect its purport it must be correct, for the privilege does not cover false statements of fact nor extend to distorted accounts." *Bock, supra,* 45 *N.J.Super.* at 307, 132 *A.*2d 523.

The concurring opinion asserts that the fair-report privilege issue centers on "whether a statement [that Costello subjected Fesl to indignities] appeared in judicial proceedings." Such an interpretation would eliminate the "full, fair and accurate" require-

ments from the fair-report privilege. As the name implies, the fair-report privilege does not protect a newspaper article unless that article is fair. Andrews' article was not fair because the quoted statements were not, as the article claims, part of a continuing complaint. Furthermore, the article, through its headline, focuses on complaints against Costello when the affidavit accompanying the complaint indicates that only Magovern remained as a party to the proceeding. Defendants do not enjoy the privilege by merely copying unsupported statements contained in court documents. The reporter is bound to explain the context of those statements in a fair and accurate manner. Because the article fails to convey "fully, fairly and accurately" the status of a pending judicial proceeding, we determine that defendants do not enjoy the protection of the fair-report privilege.

We note that an alternative basis might exist for finding that the privilege does not apply. The privilege requires that the news report cover a judicial proceeding. In *Rogers, supra,* we determined that reports on "judicial proceedings" were privileged only if the defamatory statements occurred during the official proceeding itself. The privilege did not apply to an article describing statements made in the courtroom and judge's chambers after the court had adjourned. 2 *N.J.* at 402–03, 66 *A.*2d 869; *see also Devlin v. Greiner,* 147 *N.J.Super.* 446, 453, 371 *A.*2d 380 (Law Div.1977) (observing that "statements made in the course of judicial proceedings, but not relevant thereto, are excluded from the privilege").

The privilege also does not apply to

[t]he publication ... of the contents of preliminary pleadings such as a complaint or petition, before any judicial action has been taken is not within the rule stated in this Section. An important reason for this position has been to prevent implementation of a scheme to file a complaint for the purpose of establishing a privilege to publicize its content and then dropping the action.

[*Restatement (Second) of Torts, supra,* § 611 comment e.]

"[I]t is the prevailing view, with some few courts to the contrary, that a pleading or a deposition filed in a case but not yet acted upon may not be reported under the claim of privilege." *Prosser*

& *Keeton on Torts*, *supra*, at § 115. To rule otherwise would promote the filing of lawsuits that would be promptly discontinued once the goal of public defamation or even extortion were achieved. Because the privilege does not apply to newly filed complaints, "[a] mere contemplated lawsuit not yet begun is clearly not enough" to trigger the privilege's protections. *Ibid.*

Under that reasoning, the unfiled and unsigned federal-court pleading alone would not be entitled to the fair-report privilege. In addition, we doubt that that rule could be overcome merely by filing the draft complaint as an exhibit to an affidavit in a separate proceeding that involved neither Fesl nor Costello as parties. The purpose of the fair-report privilege is not to permit republication of any paper that is filed with a court. Such a broad application of the rule would invite substantial abuse.

Neither party, however, has raised that issue. Furthermore given our holding that the fair-report privilege does not apply because the article was not a "full, fair and accurate" report, we need not resolve that thorny issue.

### III

Because the article fails to describe the official judicial proceeding fairly, fully, and accurately, the privilege is defeated. Therefore, the general fault standards govern. Under those standards, a plaintiff can prevail by showing either negligence, if the plaintiff is a private figure, or actual malice, if the defendant is a public figure. *See New York Times Co. v. Sullivan*, 376 *U.S.* 254, 279–80, 84 *S.Ct.* 710, 726, 11 *L.Ed.*2d 686, 706 (1964). Whether Costello is a public figure is "a question of law for the court's determination." *Lawrence, supra*, 89 *N.J.* at 462, 446 *A.*2d 469.

Although *New York Times v. Sullivan* involved an *elected* city commissioner, subsequent cases have concluded that non-elected government employees can be public figures for the purposes of a defamation suit. *E.g., Henry v. Collins*, 380 *U.S.* 356, 357, 85 *S.Ct.* 992, 993, 13 *L.Ed.*2d 892, 893 (1965) (holding that

chief of police is public official); *Time, Inc. v. Pape,* 401 *U.S.* 279, 284, 91 *S.Ct.* 633, 636, 28 *L.Ed.*2d 45, 50 (1971) (accepting lower courts' determination that city's Deputy Chief of Detectives was public official).

The " 'public official' designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs." *Rosenblatt v. Baer,* 383 *U.S.* 75, 85, 86 *S.Ct.* 669, 675, 15 *L.Ed.*2d 597, 605 (1966). In New Jersey, courts have consistently found that police officers are public officials and thus have applied the actual-malice standard to police officers acting in their official capacities. See *Marchiano v. Sandman,* 178 *N.J.Super.* 171, 174, 428 *A.*2d 541 (App.Div.), *certif. denied,* 87 *N.J.* 392, 434 *A.*2d 1073 (1981) (determining that, as plaintiff conceded, police officers are public officials); *La Rocca v. New York News, Inc.,* 156 *N.J.Super.* 59, 62, 383 *A.*2d 451 (App.Div.1978) (stating "we have no doubt" that police officers here were public officials); *Scelfo v. Rutgers Univ.,* 116 *N.J.Super.* 403, 412–13, 282 *A.*2d 445 (Law Div.1971) (holding that police officers "whose powers are constitutionally and statutorily derived" are public officials).

A police officer on a beat

is the member of the department who is most visible to the public. He possesses both the authority and the ability to exercise force. Misuse of his authority can result in significant deprivation of constitutional rights and personal freedoms, not to mention bodily injury and financial loss. The strong public interest in ensuring open discussion and criticism of his qualifications and job performance warrant the conclusion that he is a public official.

[*Gray v. Udevitz,* 656 *F.*2d 588, 591 (10th Cir.1981).]

As a police lieutenant, Costello's responsibilities to the public exceed those owed by officers on patrol. In addition to being visible to the public and possessing authority to use force, a lieutenant supervises other officers. Although Costello was not in charge on the night Fesl was arrested, he would be in charge of police operations at other times. The public therefore has a valid interest in Costello's qualifications and on-the-job behavior as a

lieutenant. "A wholesome respect for the law by those who are enforcing the law is ... of great importance in a society that is dedicated to the preservation of individual human dignity." *Prosser & Keeton on Torts, supra,* at § 113.

We thus determine that Costello, a police lieutenant who is challenging an article purporting to describe his official conduct, is a public official and must meet the actual-malice standard.

## IV

 The heightened actual-malice standard exists for public officials because otherwise "would-be critics of official conduct may be deterred from voicing their criticism." *Sullivan, supra,* 376 *U.S.* at 279, 84 *S.Ct.* at 725, 11 *L.Ed.*2d at 706. Without the actual-malice standard, critics of official conduct might refrain from voicing their observations, "even though [those observations are] believed to be true and even though [they are] in fact true, because of doubt whether [they] can [prove them] in court or fear of the expense of having to do so." *Ibid.* Because Costello is a public official, we must determine whether Costello's proof of actual malice is sufficient to survive defendants' motion for summary judgment.

 To survive summary judgment, a public official must prove that the statements were published either with knowledge that they were false or with reckless disregard of whether they were false. *Id.* at 279–80, 84 *S.Ct.* at 726, 11 *L.Ed.*2d at 706. To determine whether a genuine issue of material fact exists regarding actual malice, a court must consider whether the plaintiff has produced the "quantum and quality of proof" necessary under the *New York Times v. Sullivan* standard. *Schiavone, supra,* 847 *F.*2d at 1089. The plaintiff must demonstrate that a reasonable jury could conclude that "clear and convincing evidence" exists that the defendants published the article with actual malice. *Anderson v. Liberty Lobby, Inc.,* 477 *U.S.* 242, 254–55, 106 *S.Ct.* 2505, 2513, 91 *L.Ed.*2d 202, 215–16 (1986).

■ The actual-malice standard is subjective. *St. Amant v. Thompson*, 390 *U.S.* 727, 731, 88 *S.Ct.* 1323, 1325, 20 *L.Ed.*2d 262, 267 (1968). Accordingly, the inquiry concerns Andrews' state of mind. To find actual malice, the factfinder must determine that the defendant in fact entertained serious doubts about the truth of the statement or that defendant had a subjective awareness of the story's probable falsity. *Schiavone, supra*, 847 *F.*2d at 1089.

■ Rarely will direct evidence exist to meet that burden. Instead, a plaintiff might show actual malice by demonstrating that the defendant had "obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *St. Amant, supra*, 390 *U.S.* at 732, 88 *S.Ct.* at 1326, 20 *L.Ed.*2d at 268. Or the plaintiff might show that the defendant had found internal inconsistencies or apparently reliable information that contradicted the story's libelous assertions but nevertheless had published the article. *Curtis Publishing Co. v. Butts*, 388 *U.S.* 130, 161 n. 23, 87 *S.Ct.* 1975, 1995 n. 23, 18 *L.Ed.*2d 1094, 1115 n. 23 (1967) (plurality opinion). Although failure to investigate fully will not by itself be sufficient to prove actual malice, a failure to pursue the most obvious available sources for corroboration may be clear and convincing evidence of actual malice. Rodney A. Smolla, *Law of Defamation* § 3.18[1], at 3–42 (1986).

■ Because the issue of a defendant's state of mind "does not readily lend itself to summary disposition," courts are wary of disposing of cases involving actual malice through summary judgment. *Maressa v. New Jersey Monthly*, 89 *N.J.* 176, 197 n. 10, 445 *A.*2d 376, *cert. denied*, 459 *U.S.* 907, 103 *S.Ct.* 211, 74 *L.Ed.*2d 169 (1982). Plaintiffs nonetheless must produce substantial evidence to survive a motion for summary judgment. Although courts construe the evidence in the light most favorable to the non-moving party in a summary judgment motion, the "clear and convincing" standard in defamation action adds an additional weight to the plaintiffs' usual "preponderance of the evidence" burden. Smolla, *supra*, § 3.07, at 3–20.

Despite the plaintiff's heavy burden, the Court found actual malice in *Curtis Publishing, supra,* 388 *U.S.* 130, 87 *S.Ct.* 1975, 18 *L.Ed.*2d 1094. In that case only one source existed for a story that charged Coach Wally Butts with having fixed a football game. The newspaper knew that this source had criminal charges on his record. The *Saturday Evening Post* failed to consult other potential sources of information, although allegations that the story was false had been brought to the *Post*'s attention. Furthermore, the *Post*'s policy of "sophisticated muckraking" may have resulted in a stretching of standards.

Similarly, in *Schiavone, supra,* 847 *F.*2d at 1091, sufficient evidence of actual malice existed for the court to uphold the district court's denial of summary judgment. As previously mentioned, that case involved a *Time* magazine article that quoted an FBI memo linking the plaintiff's construction company with the disappearance of former union boss Jimmy Hoffa. The article neglected to state that the memo had concluded that the inclusion of the plaintiff's name in the Hoffa file did not "suggest[ ] any criminality, or organized crime associations." *Id.* at 1072.

The court found three reasons why a jury could conclude that the plaintiff had proven actual malice by the clear-and-convincing standard. First, a jury could find that "four independent sources with good bases for knowledge" had warned the defendant that the libelous information was erroneous. *Id.* at 1091. Second, a jury might disbelieve the defendant's own explanation for omitting the exculpatory information in the article. *Id.* at 1092. Third, the jury could determine that the omitted information "cast a very different and more benign light on the facts" reported, and by so altering the message of the memo, *Time* may have intended that false implication. *Ibid.* Although the court recognized that the evidence could be interpreted differently, the court found that if the evidence were interpreted in the plaintiff's favor, a jury could reasonably determine that the plaintiff had proved actual malice by the clear-and-convincing standard.

■ Sufficient evidence does not exist, however, when the only evidence offered is that the defendants "should have known the articles were false, or they at least should have doubted their accuracy." *Lawrence, supra,* 89 *N.J.* at 457, 446 *A.*2d 469. In *Lawrence,* the plaintiffs challenged a newspaper article about alleged improprieties in obtaining signatures for a petition to oppose construction of a new firehouse in Rahway. *Id.* at 455, 446 *A.*2d 469. A source in the city administration had said that the city prosecutor was investigating the possibility of forgery in petitions. The defendants assumed that the plaintiffs, Lawrence and Simpson, would be investigated because they were responsible for witnessing some petitions. *Id.* at 455–56, 467, 446 *A.*2d 469. The article was entitled, in part, "City Attorney rules association petitions improper; forgery charges may loom for Simpson." *Id.* at 456, 446 *A.*2d 469. The article erroneously stated that the city prosecutor had been asked to take action against Lawrence and Simpson, and that a case would be based on forgery and false swearing of oaths and affidavits. *Ibid.*

■ We determined that only subjective evidence will satisfy the actual-malice burden:

the liability question is not one of reasonableness when public figures and media defendants are involved. Rather, the focus of the 'actual malice' inquiry is on a defendant's *attitude* toward the truth or falsity of the publication, on his *subjective* awareness of its probable falsity, and his *actual* doubts as to its accuracy.
[*Id.* at 467–68, 446 *A.*2d 469 (citations omitted).]

We characterized the assumption that Lawrence was being investigated a "misconception" and a "careless and perhaps irresponsible account" of the information the paper had received from its informant in City administration. *Id.* at 468, 446 *A.*2d 469. But that evidence was insufficient to show that the defendants had known that the articles were false or that they had actually doubted their accuracy.

In *Schwartz v. Worrall Publications, Inc.,* 258 *N.J.Super.* 493, 500–03, 610 *A.*2d 425 (App.Div.1992), the plaintiff also failed to carry the burden of proving actual malice. That case involved an article that erroneously stated that the plaintiff was the subject of

an investigation by the State Commission of Investigation for receiving allegedly excessive legal fees by the State School Boards Association. The defendant denied knowing that the article was false, and the Appellate Division could find no evidence in the record to contradict that asserted belief. The court determined that the article was a "mish-mash ... express[ing] obvious confusion and a lack of understanding of the subject." *Id.* at 503, 610 *A.*2d 425.

Applying the actual-malice standard through the prism of summary judgment, *Schiavone, supra,* 847 *F.*2d at 1091, we find that even when considering the evidence in the light most favorable to Lieutenant Costello, a reasonable factfinder could not find "clear and convincing" evidence of Andrews' actual malice. *See Liberty Lobby, supra,* 477 *U.S.* at 255, 106 *S.Ct.* at 2513–14, 91 *L.Ed.*2d at 216.

In an effort to demonstrate actual malice, Costello points to the fact that Andrews apparently ignored the affidavit accompanying the draft complaint that specifically stated that all parties except Officer Magovern had entered releases when reporting that the complaint was presently pending. Andrews, however, points to evidence showing why he believed the complaint was pending. For example, Guiliano's affidavit described the draft complaint as a filed Notice of Claim that had been forwarded to each of the parties. The *Observer* sent Andrews to the courthouse specifically to find the Notice of Claim for the specified docket number.

Costello also claims that before sending the article for publishing, Andrews should have conducted a more thorough investigation. He at least should have attempted to contact Fesl or Guiliano. Andrews did, however, attempt to communicate with Costello, Officer Magovern, and other Borough officials, and he did call Ronald Hoffman, the Borough's attorney, for verification of the status of the complaint. Although Hoffman states in his certification that he informed Andrews that the statute of limitations had expired on claims against Lieutenant Costello, he also

states that by the time he conveyed that information to Andrews, the newspaper may have already begun printing the article.

Although Costello urges that a fuller investigation was required, failing to investigate more fully "merely establishes possible negligence—it does not establish subjective knowledge of falsity or serious doubt about the truth of the story." Smolla, *supra*, § 3.17, at 3–40.2. Costello fails to point to any proof suggesting that Andrews actually doubted that Fesl's claim was true or doubted that the complaint was pending.

At most, defendants' article demonstrates a confused understanding of a court file. The article correctly noted that the complaint had been "filed" but not signed. The article fails to explain that the complaint was not filed in its own right, but was an exhibit in a separate proceeding. Andrews was a new reporter. He had been graduated from college only the year before and had worked for the paper for only seven months when he wrote this article. We do not mean to imply that inexperience is an excuse for shoddy reporting. However, Andrews' inexperience must be considered in determining whether his failure properly to understand the documents in a court file was a result of actual malice or negligence. A plaintiff must demonstrate more than an erroneous interpretation of the facts to demonstrate actual malice. *Time v. Pape*, 401 *U.S.* 279, 291, 91 *S.Ct.* 633, 639, 28 *L.Ed.*2d 45, 54 (1971). Although we do not condone the erroneous reporting of information in court files, we realize that journalists are not lawyers by trade. Errors in reports on court proceedings are bound to occur from time to time, and the First Amendment protects those errors as long as they are not recklessly or intentionally made.

Because Costello has not produced "clear and convincing" evidence of actual malice, *i.e.*, that defendants published the article with knowledge of the article's falsity or with reckless disregard for whether the article was true or false, we remand for entry of an order granting defendants summary judgment.

We recognize the important role journalists play in disseminating news. We recognize that newspapers face competitive pres-

sure to investigate stories quickly and to "scoop" other newspapers. Nonetheless, shoddy and careless reporting that leads to the dissemination of false or misleading information is detrimental to the enlightenment of a free society. A newspaper's greatest reward is the public's trust. Defendants today narrowly escape liability, but they do not escape the loss of credibility that results from slipshod journalism.

The judgment of the Appellate Division is affirmed.

## APPENDIX

### Complaint alleges Seaside cop fondled woman

By WHIT ANDREWS

Staff Writer

SEASIDE HEIGHTS—A Lakehurst woman is alleging she was handcuffed, beaten and improperly strip-searched by police officers in a May 1988 incident here.

Elizabeth Fesl claims in papers filed in state Superior Court that she was smashed into a brick wall and that a male police lieutenant illegally fondled her breasts and genitalia because she broke a window.

The police report from the incident and a witness's account claim that Fesl attacked the police officer and that he only defended himself and used acceptable force to subdue her.

The claim is one of a series of complaints and notices of intent to sue against the borough's Police Department, which has come under fire in recent months from people alleging police brutality.

The strip-search allegations are not addressed in the arrest report.

According to the court papers, Patrolman James Magovern III and two other officers were called to a scene of a fight between Fesl and her sister at about 2:30 a.m. May 17, 1990.

The claim following the incident was filed by Nicholas Guiliano, a borough resident, on the woman's behalf. The claim is a notice of intent to sue in U.S. District Court on the grounds of deprivation of civil rights.

The claim also has been filed as an exhibit in Guiliano's request for a Superior Court order to demand some of Magovern's employment records from the borough.

Seaside Heights Borough Attorney Ronald E. Hoffman had no comment when asked about the notice of intent or pending litigation.

When Magovern arrived, Fesl claims, he dragged her down a flight of brick stairs, handcuffed her and dragged her 40 feet over a concrete slab, all without speaking to her to find out who she was or what she was doing.

However, in his report, Magovern claims that Fesl eluded him and his fellow officers when they reported to the call of a fight.

When he found her at the back of the house, he says in the report, she refused repeatedly to talk to him and tried to strike him with her open hand.

In a statement she gave police, Sharon Scalise, then-manager of the Last Resort Motel, where the window was broken, claimed that Fesl attacked Magovern and "beat him up."

"She started swinging at him," Scalise said. "She was beating the officer ... she struck him."

But Fesl claims that after she was handcuffed, Magovern deliberately smashed her head into a brick wall.

Later in the claim, Fesl contends that a doctor who examined her determined she had a hairline fracture of her skull and a "subdural hematoma," or bruise.

Her claim also alleges she "suffered numerous abrasions, contusions, lacerations (and) a concussion."

Scalise said in her statement that before police arrived, Fesl's face was covered with scratches from the fight with her sister.

Fesl claims that Magovern, now a patrolman for the Dover Township Police Department, threatened to "drag her commie ass in jail, where (Magovern) would take care of her."

Fesl is of Eastern European extraction, she says in the claim, and was speaking to her sister in her native tongue when arrested.

The arrest report lists her nationality as German.

When Fesl got to the police station, the claim says, Lt. James Costello forced her to bend over and "proceeded to search and 'feel up' the Plaintiff–Fesl's genital and anal areas ... (he) fondled and breached the Plaintiff–Fesl's breasts, all while Fesl was still handcuffed."

"When Fesl responded that this was blatantly illegal and illegitimate," the claim says, "Costello replied, 'What's the matter, don't you like it?'"

By law, strip-searches must be conducted by members of the same sex in private rooms, said Chris Florentz, a spokesman for the state Attorney General's office.

No complaints were signed against Costello in connection with the incident, however, despite a lengthy sheet of charges Guiliano and Fesl filed against Magovern.

Costello has said in the past that he will not comment on matters in which he is involved that are the subject of pending litigation.

Guiliano and Fesl are contesting the charges brought against her and are charging Magovern with various offenses, including assault.

Magovern charged Fesl with disorderly conduct and obstructing justice after an incident in which she broke a neighbor's window while she was loading a car and arguing with her sister.

Guiliano was charged with obstructing justice in connection with the incident about four months later.

Fesl claims that Guiliano agreed to pay for the window, and did so, but that she was arrested anyway despite the fact that no one wished to sign complaints against her.

No charges stemming from the incident have any relevance to the broken window, according to court records.

O'HERN, J., concurring.

I concur in the judgment of the Court. I believe, however, that the Court has more closely circumscribed the fair-report privilege than the law requires.

The Court is justly troubled by the reporter's misinterpretation of the documents, particularly the reporter's use of the present tense in this sentence appearing in the newspaper article: "Elizabeth Fesl claims in papers filed in state Superior Court * * * that a male police lieutenant illegally fondled her * * *." Except for the tense of the sentence, however, that is the truth of the matter. Although Fesl never did pursue her complaint, the reporter explained that "[n]o complaints were signed against Costello in connection with the incident, however, despite a lengthy sheet of charges * * *."

The story was not unbalanced to the extent that contrary information discrediting Fesl was available. The story reported that one of the other involved police officers claimed that Fesl had eluded him and fellow officers. It recites that Fesl "tried to strike him with her open hand." The account also includes statements of an independent witness: "She [Fesl] started swinging at him[.] * * * She was beating the officer ... she struck him."

The young reporter assigned to the case may not have fully grasped the import of the various documents. The proceeding was somewhat tangled. The file in which the reporter found the statements concerned a Superior Court proceeding that was ancillary to a pending municipal-court proceeding in which Guiliano

was a defendant. Both Guiliano and Fesl had been defendants in municipal court as a result of the 1988 arrest incident as well as potential plaintiffs in a civil proceeding arising therefrom. Guiliano also filed criminal complaints against a Seaside Heights police officer. No one could easily explain in a few words the relationship of those varied pleadings.

In *Time, Inc. v. Pape*, 401 *U.S.* 279, 91 *S.Ct.* 633, 28 *L.Ed.*2d 45 (1971), the Supreme Court explained that a reporter's misunderstanding of a government document charging patterns of police brutality should not be a basis for imposition of damages. In that case, the *Time* magazine article reported as a charge by a commission investigating police brutality what was in literal terms a description by the commission of allegations in a complaint by a plaintiff in a civil-rights action. The police official, subjected to the criticism of police brutality, complained of the misinterpretation. The Supreme Court wrote: "New York Times [*v. Sullivan*, 376 *U.S.* 254, 84 *S.Ct.* 710, 11 *L.Ed.*2d 686 (1964),] was premised on a recognition that, as Madison put it, 'Some degree of abuse is inseparable from the proper use of every thing; and in no instance is this more true than in that of the press.'" 401 *U.S.* at 290, 91 *S.Ct.* at 639, 28 *L.Ed.*2d at 53 (quoting 4 *J. Elliot's Debates on the Federal Constitution* 571 (1876)).

The Court repeated the theme of *New York Times:*

"A rule compelling the critic of official conduct to guarantee the truth of all his factual assertions * * * leads to ... 'self-censorship.' * * * [W]ould-be critics of official conduct may be deterred from voicing their criticism, even though it is believed to be true and even though it is in fact true, because of doubt whether it can be proved in court or fear of the expense of having to do so."

[*Id.* at 290, 91 *S.Ct.* at 639–40, 28 *L.Ed.*2d at 53–54 (quoting *New York Times, supra,* 376 *U.S.* at 279, 84 *S.Ct.* at 725, 11 *L.Ed.*2d at 706).]

The Court then wrote:

These considerations apply with even greater force to the situation where the alleged libel consists in the claimed misinterpretation of the gist of a lengthy government document. Where the document reported on is so ambiguous as this one was, it is hard to imagine a test of "truth" that would not put the publisher virtually at the mercy of the unguided discretion of a jury.

[*Id.* at 291, 91 *S.Ct.* at 640, 28 *L.Ed.*2d at 54.]

Hence, courts should accord some degree of liberality in evaluating a claimed misrendering of the gist of legal proceedings. For example, how might a newspaper publish or a broadcaster transmit, without comment, a portion of the daily testimony in a sensational criminal trial when that segment includes damaging accusations against a public official? Must the news organization publish the entire day's testimony, including the cross-examination and rebuttal testimony, to ensure that its report is full, fair, and accurate? For a report to be characterized as fair and true, it should be enough that the content of the article be substantially accurate. In a fair report, the " ' "defendant is not required * * * to justify every word of the alleged defamatory matter; it is sufficient if the substance, the gist, the sting of the libelous charge be justified...." ' " *Reader's Digest Ass'n v. Superior Ct.,* 37 *Cal.*3d 244, 208 *Cal.Rptr.* 137, 149 n. 13, 690 *P.*2d 610, 622 n. 13 (1984) (quoting *Hayward v. Watsonville Register–Pajaronian & Sun,* 265 *Cal.App.*2d 255, 71 *Cal.Rptr.* 295, 300 (1968) (quoting *Kurata v. Los Angeles News Publishing Co.,* 4 *Cal.App.*2d 224, 40 *P.*2d 520, 522 (1935))), *cert. denied,* 478 *U.S.* 1009, 106 *S.Ct.* 3307, 92 *L.Ed.*2d 720 (1986). *See Herrmann v. Newark Morning Ledger Co.,* 48 *N.J.Super.* 420, 431–32, 138 *A.*2d 61 (App.Div.) (ruling that false statement in publication that "does not go to the gist or sting of the libel does not render an otherwise true statement defamatory"), *aff'd,* 49 *N.J.Super.* 551, 140 *A.*2d 529 (App.Div.1958).

[That conclusion] rests upon the realization that newspaper accounts of legislative or other official proceedings must be accorded some degree of liberality. When determining whether an article constitutes a "fair and true" report, the language used therein should not be dissected and analyzed with a lexicographer's precision. This is so because a newspaper article is, by its very nature, a condensed report of events which must, of necessity, reflect to some degree the subjective viewpoint of its author. Nor should a fair report which is not misleading, composed and phrased in good faith under the exigencies of a publication deadline, be thereafter parsed and dissected on the basis of precise denotative meanings which may literally, although not contextually, be ascribed to the words used.

[*Holy Spirit Ass'n for the Unification of World Christianity v. New York Times Co.,* 49 *N.Y.*2d 63, 424 *N.Y.S.*2d 165, 167, 399 *N.E.*2d 1185, 1187 (1979).]

Courts should not permit a plaintiff to recover for defamation simply because a reporter has technically misused a legal term or has misunderstood a legal document. Lackland H. Bloom, Jr., *The Press and the Law: Some Issues in Defamation Litigation Involving Media Coverage of Legal Affairs and Proceedings*, 43 *Sw.L.J.* 1011, 1044–45 (1990); *see also Sivulich v. Howard Publications, Inc.*, 126 *Ill.App.*3d 129, 81 *Ill.Dec.* 416, 418, 466 *N.E.*2d 1218, 1220 (1984) (refusing to conclude that statement " '[c]harges of aggravated battery have been filed' " against plaintiff appeared misleading in that it necessarily implied that police had filed criminal, as opposed to civil, charges) (quoting news article) (alteration in original); *Lawrence v. Bauer Publishing & Printing Ltd.*, 89 *N.J.* 451, 446 *A.*2d 469 (reversing verdict for plaintiff when defendants misunderstood source's tip regarding election-fraud investigation), *cert. denied*, 459 *U.S.* 999, 103 *S.Ct.* 358, 74 *L.Ed.*2d 395 (1982).

So viewed, the fair-report privilege is analogous to the doctrine of neutral reportage. In *Edwards v. National Audubon Society, Inc.*, 556 *F.*2d 113 (2d Cir.), *cert. denied*, 434 *U.S.* 1002, 98 *S.Ct.* 647, 54 *L.Ed.*2d 498 (1977), the court set aside a libel verdict against the *New York Times*, which had accurately reported false defamatory accusations made by a National Audubon Society official against prominent scientists concerning the use of the insecticide DDT. In that context, the court wrote: "[I]f we are to enjoy the blessings of a robust and unintimidated press, we must provide immunity from defamation suits where the journalist believes, reasonably and in good faith, that his report accurately conveys the charges made." *Id.* 556 *F.*2d at 120.

The neutral-reportage privilege

can perhaps best be explained by analogy to a report of a witness' testimony at trial as protected by the fair report privilege. The witness is held to be responsible for his own testimony (i.e., perjury), regardless of its public interest value. The publisher who prints that testimony is not held responsible for it, because of the fair report privilege, even though it may be false and defamatory. The publisher is protected because of the public's interest in reading the testimony in order to resolve for itself the issues at trial (and thus evaluate the fairness and conduct of the trial).

[David Marburger, *More Protection for the Press: The Third Circuit Expands the Fair Report Privilege,* 43 *U.Pitt.L.Rev.* 1143, 1160 (1982).]

Such a view of the privilege "provid[es] protection for the republisher to help the public resolve the issues of life. * * * The statement provides the public with knowledge of what is being said about the issues of the day and by whom, while at the same time prompting further inquiry and possible resolution of those issues." *Ibid.*

Judges are ill equipped to act as city editors. Court documents disclosed a draft complaint reciting sexual harassment of a woman by a public official. The public had an interest in knowing what was in those court documents. The *Observer's* story reported the gist of what was in that court file.

O'HERN, J., concurring in result.

*For affirmance*—Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—6.

*Opposed*—None.